[Cite as *Savoy Hospitality, L.L.C. v. 5839 Monore St. Assocs., L.L.C.*, 2015-Ohio-4879.]

# IN THE COURT OF APPEALS OF OHIO
## SIXTH APPELLATE DISTRICT
## LUCAS COUNTY

SAVOY HOSPITALITY, LLC, D/B/A
MELTING POT RESTAURANT, ET AL.,

    CASE NO. L-14-1144

  PLAINTIFFS-APPELLEES,

 v.

5839 MONROE STREET ASSOCIATES    O P I N I O N
LLC,  D/B/A MONROE ASSOCIATES, LLC,

  DEFENDANT-APPELLANT.

Appeal from Lucas County Common Pleas Court

Trial Court No. CI-2011-02783

Judgment Affirmed

Date of Decision:    November 13, 2015

APPEARANCES:

    *Erik G. Chappell* for Appellant

    *Anthony J. Calamunci and Amy L. Butler* for Appellees

**PRESTON, J.**

{¶1} Defendant-appellant, 5839 Monroe Street Associates, LLC, d/b/a Monroe Associates, LLC ("Monroe"), appeals the June 13, 2014 judgment of the Lucas County Court of Common Pleas. For the reasons that follow, we affirm the decision of the trial court.

{¶2} On April 13, 2011, plaintiffs-appellees, Savoy Hospitality, LLC, d/b/a Melting Pot Restaurant ("Savoy"), Nicole D. Duhart ("Nicole"), and Myron C. Duhart ("Myron") (collectively, "Plaintiffs") filed a complaint against Monroe alleging breach of a lease agreement. (Doc. No. 1). On June 8, 2011, Monroe filed its answer and counterclaim. (Doc. No. 9). On August 17, 2011, Monroe filed its first amended counterclaim. (Doc. No. 26).

{¶3} On September 6, 2011, Monroe filed a "Motion for Immediate Hearing on Defendant's Claim for Eviction (Count II of the First Amended Counterclaim), and for Restitution of the Premises." (Doc. No. 27).

{¶4} On September 16, 2011, Plaintiffs filed their answer to Monroe's counterclaim and first amended counterclaim. (Doc. No. 29).

{¶5} On October 25, 2011, the parties reached a written settlement agreement. (*See* Doc. No. 49).

{¶6} On November 29, 2011, Monroe filed a motion for leave to file its second amended counterclaim instanter. (Doc. No. 30). On January 4, 2012, the

trial court granted Monroe's motion for leave to file a second amended counterclaim instanter. (Doc. No. 33). On January 18, 2012, Monroe filed its second amended counterclaim. (Doc. No. 34).

{¶7} On January 19, 2012, Plaintiffs filed a motion for leave to file a motion to enforce the settlement agreement instanter. (Doc. No. 35). On February 3, 2012, Monroe filed a memorandum in opposition to Plaintiffs' motion to enforce the settlement agreement. (Doc. No. 37). On February 10, 2012, Monroe filed a supplemental memorandum in opposition to Plaintiffs' motion to enforce the settlement agreement. (Doc. No. 38). On February 21, 2012, Plaintiffs filed a supplemental memorandum and affidavit in support of their motion to enforce the settlement agreement. (Doc. No. 41). On March 2, 2012, the trial court granted Plaintiffs' motion for leave to file their motion to enforce the settlement agreement instanter, and Plaintiffs filed a motion to enforce the settlement agreement. (Doc. Nos. 42, 44). That same day, Monroe filed its response to Plaintiffs' supplemental memorandum and affidavit in support of its motion to enforce the settlement agreement. (Doc. No. 43).

{¶8} On March 5, 2012, the trial court granted Plaintiffs' oral motion for leave to file a response to Monroe's second amended counterclaim. (Doc. No. 45).

{¶9} On April 11, 2012, the trial court granted Plaintiffs' motion to enforce the settlement agreement "insofar as the court finds that a settlement agreement

exists and an evidentiary hearing to determine whether the plaintiffs have defaulted on their obligations under the agreement is justified." (Doc. No. 47). On May 1, 2012, a hearing was held to determine the scope of the parties' remaining rights and obligations under the settlement agreement. (Doc. Nos. 48, 49). The trial court filed its entry on May 18, 2012,[1] in which it ordered Plaintiffs to effect certain repairs to the premises—to replace light fixtures and light switches, to take out the rest of a walk-in refrigerator, to replace awnings, to replace a speaker/stereo system, and to clean—and ordered Monroe to return Plaintiffs' security deposit once those repairs were completed. (Doc. No. 49).

{¶10} On June 11, 2012, Monroe filed a motion for attorney fees. (Doc. No. 50). On June 19, 2012, Plaintiffs filed a memorandum in opposition to Monroe's motion for attorney fees and a "countermotion" for sanctions. (Doc. No. 51). On June 27, 2012, Monroe filed a "Reply in Further Support of Its Motion for Attorneys' Fees and Opposition to Plaintiffs' Counter-Motion for Sanctions." (Doc. No. 52).

{¶11} On September 10, 2012, Plaintiffs filed a motion to enforce the May 18, 2012 order. (Doc. No. 53). On September 25, 2012, Monroe filed a memorandum in opposition to Plaintiffs' motion to enforce the May 18, 2012 order. (Doc. No. 54). On September 28, 2012, Plaintiffs filed a reply

---

[1] The judgment entry was file stamped May 18, 2012 and e-journalized May 22, 2012.

memorandum in support of its motion to enforce the May 18, 2012 order. (Doc. No. 55).

{¶12} On November 30, 2012, the trial court denied Monroe's June 11, 2012 motion for attorney fees and Plaintiffs' June 19, 2012 "countermotion" for sanctions and granted Plaintiffs' September 10, 2012 motion for the return of the security deposit. (Doc. No. 58). The trial court ordered Monroe to return the balance of the security deposit still in its possession. (*Id.*).

{¶13} On December 31, 2012, Plaintiffs filed a motion for contempt. (Doc. No. 59). On January 8, 2013, Monroe filed a memorandum in opposition to Plaintiffs' motion for contempt. (Doc. No. 60).

{¶14} On January 8, 2013, Monroe filed a motion to enforce the settlement agreement and the mutual release. (Doc. No. 61). On January 18, 2013, Plaintiffs filed a reply memorandum in support of their motion for contempt, a memorandum in opposition to Monroe's motion to enforce the settlement agreement and the mutual release, and a request for a hearing. (Doc. No. 62).

{¶15} On January 22, 2013, Plaintiffs filed a motion for an emergency order to secure the security deposit and for additional sanctions. (Doc. No. 63). On January 24, 2013, Monroe filed a memorandum in opposition to Plaintiffs' motion for an emergency order to secure the security deposit and for additional sanctions. (Doc. No. 64).

{¶16} On February 20, 2013, the trial court "asked the parties to attempt to negotiate a stipulated resolution of the remaining issues"—"plaintiffs' motion for contempt filed under seal on December 31, 2012; [Monroe's] motion to enforce settlement agreement filed under seal January 8, 2013; and [Plaintiffs'] motion for an emergency order to secure deposit and for additional sanctions, filed January 22, 2013"—"by March 1, 2013." (Doc. No. 65).

{¶17} On July 9, 2013,[2] the trial court granted Plaintiffs' December 31, 2012 motion, which the trial court construed "as a motion for the defendant and its counsel to show cause why they should not be held in contempt," scheduled a contempt hearing for August 12, 2013, and denied Monroe's January 8, 2013 motion to enforce the settlement agreement. (Doc. No. 66).

{¶18} Monroe filed a notice of appeal on August 2, 2013 of the July 9, 2013 judgment entry. (Doc. No. 70). On August 6, 2013, the parties stipulated that the amount of the security deposit is $18,000.00. (Doc. No. 71).

{¶19} On April 14, 2014, this court sua sponte dismissed the appeal after concluding that the July 9, 2013 judgment entry was not a final and appealable order under R.C. 2505.02 and Civ.R. 54(B). (Doc. No. 75).

{¶20} On June 13, 2014,[3] the trial court issued a "Stipulated Order Regarding Journal Entry, Journalized on July 12, 2013." (Doc. No. 76).

---

[2] The judgment entry was file stamped July 9, 2013 and e-journalized July 12, 2013.
[3] The judgment entry was file stamped June 13, 2014 and e-journalized June 17, 2014.

**{¶21}** Monroe filed its notice of appeal on July 1, 2014. (Doc. No. 18). Monroe raises three assignments of error. For ease of our discussion, we will address together Monroe's first and third assignments of error, followed by Monroe's second assignment of error.

## Assignment of Error No. I

**The Trial Court Erred When It Granted Appellees' Motion To Enforce Settlement Agreement.**

## Assignment of Error No. III

**The Trial Court Erred When It Denied Appellant's Motion To Enforce Settlement Agreement And Mutual Release.**

**{¶22}** In its first and third assignments of error, Monroe argues that the trial court erred by granting Plaintiffs' motion to enforce the settlement agreement and by denying Monroe's motion to enforce the settlement agreement and mutual release. Specifically, in its first assignment of error, Monroe argues that the trial court erred by granting Plaintiffs' motion to enforce the settlement agreement because Plaintiffs failed to pay a utility bill and to execute certain repairs as they were obligated to do under the settlement agreement, and because Plaintiffs improperly removed property from the leased premises. In its third assignment of error, Monroe specifically argues that the trial court erred in ordering Monroe to return Plaintiffs' security deposit because Plaintiffs waived any claims—including any claim to the security deposit—through the mutual release, which is attached to the settlement agreement.

**{¶23}** "Settlement agreements are essentially a contract and are governed by the law of contracts." *Raymond J. Schaefer, Inc. v. Pytlik*, 6th Dist. Ottawa No. OT-09-026, 2010-Ohio-4714, ¶ 24, citing *Rondy, Inc. v. Goodyear Tire Rubber Co.*, 9th Dist. Summit No. 21608, 2004-Ohio-835, ¶ 7. "A settlement agreement is a contract designed to terminate a claim by preventing or ending litigation." *Infinite Sec. Solutions, L.L.C. v. Karam Propertis, II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, ¶ 16. "Because a settlement agreement constitutes a binding contract, a trial court has authority to enforce the agreement in a pending lawsuit." *Id.*

**{¶24}** "Generally, if a motion to enforce a settlement agreement surrounds an agreement of undisputed terms, the issue is one of contract law; thus the standard of review is whether the trial court erred as a matter of law." *Moore v. Johnson Industries Corp.*, 10th Dist. Franklin Nos. 96APE11-1579, 96APE12-1638, and 96 APE12-1703, 1997 WL 771015, *12 (Dec. 11, 1997), citing *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). "De novo review requires us to conduct an independent review of the record without deference to the trial court's decision." *Matrix Technologies, Inc. v. Kuss Corp.*, 6th Dist. Lucas No. L-07-1301, 2008-Ohio-1301, ¶ 11, citing *Brown v. Cty. Commrs. of Scioto Cty.*, 87 Ohio App.3d 704, 711 (4th Dist.1993).

**{¶25}** "However, if the agreement's terms are in dispute, the issue of whether the trial judge should enforce the alleged settlement agreement is reviewed under an abuse of discretion standard." *Moore* at *12, citing *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997). "T*he abuse of discretion standard focuses on more than whether an error of law has occurred; it also addresses whether the trial court's attitude is unreasonable, arbitrary or unconscionable." *Id.*, citing *State ex rel. Hillyer v. Tuscarawas Cty. Bd. of Commrs.*, 70 Ohio St.3d 94, 97 (1994). "'[I]t is within the sound discretion of the trial court to enforce a settlement agreement, and its judgment will not be reversed where the record contains some competent, credible evidence to support its findings regarding the settlement.'" *Bankers Trust Co. v. Wright*, 6th Dist. Fulton No. F-09-009, 2010-Ohio-1697, ¶ 15, quoting *Mentor v. Lagoons Point Land Co.*, 11th Dist. Lake No. 98-L190, 1999 WL 1313674, *4 (Dec. 17, 1999). *See also Fine v. U.S. Erie Islands Co., Ltd.*, 6th Dist. Ottawa No. OT-07-048, 2009-Ohio-1531, ¶ 25, citing *The Four Howards, Ltd. v. J & F Wenz Rd. Invest., L.L.C.*, 179 Ohio App.3d 399, 2008-Ohio-6174, ¶ 63 (6th Dist.), citing *State v. Clements*, 5th Dist. Licking No. 08 CA 31, 2008-Ohio-5549, ¶ 11. "Where there is a dispute regarding the meaning of the terms of a settlement agreement or where there is a dispute of whether a valid settlement agreement exists, a trial court must conduct an evidentiary hearing." *Bankers Trust Co.* at ¶ 15, citing *Rulli* at syllabus.

{¶26} "To establish a breach of a settlement agreement, the party alleging the breach must prove: 1) existence of the [s]ettlement [a]greement, 2) performance by the [nonbreaching party], 3) breach by the [other party], 4) resulting damages or loss to the [nonbreaching party]." *Raymond J. Schaefer, Inc.*, 2010-Ohio-4714, at ¶ 24. "The party seeking to enforce the settlement agreement bears the burden to prove, by a preponderance of the evidence, all of the elements of a claim for breach of a settlement agreement." *Rondy, Inc.*, 2004-Ohio-835, at ¶ 7, citing *Cooper & Pachell v. Haslage*, 142 Ohio App.3d 704, 707 (9th Dist.2001), quoting *AMF, Inc. v. Mravec*, 2 Ohio App.3d 29 (8th Dist.1981), paragraph two of the syllabus.

{¶27} "In cases where the facts are undisputed, and the only question to be resolved is whether a breach of contract occurred, a question of law exists for the court to decide." *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, ¶ 77 (6th Dist.), citing *Farmers Market Drive-In Shopping Ctrs., Inc. v. Magana*, 10th Dist. Franklin No. 06AP-532, 2007-Ohio-2653, ¶ 32.

{¶28} However, when parties dispute whether their respective actions were sufficient to satisfy the terms of a settlement agreement, the trial court is presented with a question of fact to decide. *Nippon Life Ins. Co. of Am. v. One Source Mgt., Ltd.*, 6th Dist. Lucas No. L-10-1247, 2011-Ohio-2175, ¶ 17, citing *Blake Homes, Ltd.* at ¶ 77, citing *Farmers Market Drive-In Shopping Ctrs., Inc.* at ¶ 32 and *Butler Cty. Bd. of Commrs. v. Hamilton*, 145 Ohio App.3d 454, 478 (12th

Dist.2001) (concluding that disputed good-faith efforts to satisfy contract conditions are factual issues). "In either a civil or criminal trial, 'the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.'" *Blake Homes, Ltd.* at ¶ 78, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "On appeal, a reviewing court must defer to the determination of the [trier of fact] as to such issues, because it was 'in the best position to observe the witness' demeanor, voice inflection, and mannerisms.'" *Id.*, quoting *State v. Ballard*, 8th Dist. Cuyahoga No. 88279, 2007-Ohio-4017, ¶ 23, citing *DeHass* at paragraph one of the syllabus. Accordingly, an appellate court reviews whether the trial court's findings are against the manifest weight of the evidence and will not disturb the trial court's findings if they are supported by some competent, credible evidence. *Nippon Life Ins. Co.* at ¶ 18; *Business Resource Group, L.L.C.*, 9th Dist. Wayne No. 09CA0069, 2011-Ohio-399, ¶ 11.

{¶29} "A court's primary objective in the construction of any written agreement is to ascertain and give effect to the intent of the parties by examining the language that they chose to employ." *O.E. Meyer Co. v. BOC Group, Inc.*, 6th Dist. Erie No. E-99-002, 2000 WL 234549, *5 (Mar. 3, 2000), citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). First, a court must determine whether the disputed language is plain and unambiguous. *Beverly v. Parilla*, 165 Ohio App.3d 802,

2006-Ohio-1286, ¶ 24 (7th Dist.). *See also Aultman Hosp. Assn v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). "The language is unambiguous if, from reading only the four corners of the instrument, the language is clear, definite, and subject to only one interpretation." *Beverly* at ¶ 24. "Contract language is ambiguous 'if it is unclear, indefinite, and reasonably subject to dual interpretations.'" *Mulchin v. ZZZ Anesthesia, Inc.*, 6th Dist. Erie No. E-05-045, 2006-Ohio-5773, ¶ 36, quoting *Beverly* at ¶ 24. *See also Bay Coast Properties, Inc. v. Natl. City Bank*, 6th Dist. Huron No. H-05-015, 2006-Ohio-2348, ¶ 15 (noting that "[t]he test for determining whether contract terms are ambiguous" is: "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument"), quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus.

{¶30} "If it is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties" and "[t]he interpretation of a written agreement is * * * a matter of law for the court," which an appellate court reviews de novo. *O.E. Meyer Co.* at *5, citing *Aultman Hosp. Assn.* at 53; *Bottomline Ink, Corp. v. Huntington Bancshares, Inc.*, 6th Dist. Wood No. WD-08-003, 2008-Ohio-2987, ¶ 11, citing *Alexander* at paragraph one of the syllabus; *Matrix Technologies, Inc.*, 2008-Ohio-1301, at ¶ 11,

citing *Grabnic v. Doskocil*, 11th Dist. Portage No. 02-P-0116, 2005-Ohio-2887, ¶ 12.

**{¶31}** "When a court finds an ambiguity in the contract language, the intent of the parties becomes a question of fact; in order to ascertain such intent, the trier of fact may rely on extrinsic evidence." *Mulchin* at ¶ 36, citing *Beverly* at ¶ 26. *See also Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984) ("However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "'We will not reverse a factual finding of the trial court so long as some competent, credible evidence supports it.'" *Am. Servicing Corp. v. Wannemacher*, 3d Dist. Putnam No. 12-14-01, 2014-Ohio-3984, ¶ 15, quoting *Crane Hollow, Inc. v. Marathon Ashland Pipe Line*, LLC, 138 Ohio App.3d 57, 74 (4th Dist.2000)*, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. *See also Myers v. Garson*, 66 Ohio St.3d 610, 614 (1993).

**{¶32}** "The parol evidence rule prohibits a party from contradicting or supplementing a written, fully-integrated contract with extrinsic evidence of prior or contemporaneous agreements, whether oral or written." *Bottomline Ink, Corp.* at ¶ 11, citing *Ed Schory & Sons, Inc. v. Society Natl. Bank*, 75 Ohio St.3d 433, 440 (1996). "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the

contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, ¶ 12.

{¶33} The parties do not dispute that they executed a valid settlement agreement but dispute whether the trial court erred in enforcing the settlement agreement after determining that Monroe failed to satisfy its burden of demonstrating that Plaintiffs breached the settlement agreement. In particular, Monroe argues (1) that Plaintiffs' failure to timely remit the outstanding utility bill breached the settlement agreement and (2) that Plaintiffs' "failure to undertake the necessary repairs and replacements as delineated after Monroe's inspection" "constituted a breach of the settlement agreement," even though Plaintiffs "ultimately made the repairs and replacements after being ordered to do so by the trial court." (Appellant's Brief at 21).

{¶34} Monroe is essentially arguing that the trial court erred as a matter of law in enforcing the settlement agreement because the trial court erred as a matter of law in concluding that Plaintiffs did not breach the settlement agreement. As such, Monroe urges this court to review de novo the enforcement of the settlement agreement and whether Plaintiffs breached the settlement agreement.

{¶35} We review the trial court's decision to grant Plaintiffs' motion to enforce the settlement agreement for an abuse of discretion because the parties dispute the settlement agreement's terms. To determine whether to enforce the

settlement agreement in this case, the trial court was required to interpret the language the parties chose to employ in their settlement agreement to determine whether Monroe satisfied its burden of proving that Plaintiffs breached that settlement agreement. Specifically, to accomplish that, the trial court interpreted Paragraphs 5 and 10 of the settlement agreement.

{¶36} We first address Monroe's argument that Plaintiffs' late remittance of the utility bill constituted a breach under Paragraph 5 of the settlement agreement. Accordingly, we are tasked with reviewing (1) the trial court's interpretation of Paragraph 5 of the settlement agreement, (2) the trial court's conclusion that Plaintiffs did not breach Paragraph 5 of the settlement agreement, and (3) the trial court's decision to grant Plaintiffs' motion to enforce the settlement agreement with respect to payment of the utility bill. Because it is a matter of contract interpretation, we review de novo the trial court's interpretation of Paragraph 5 of the settlement agreement. However, we review the trial court's conclusion that Plaintiffs did not breach Paragraph 5 of the settlement agreement under a manifest-weight-of-the-evidence standard because the parties dispute whether Plaintiffs' actions were sufficient to comply with Paragraph 5. Because whether Monroe satisfied its burden of proving that Plaintiffs breached Paragraph 5 of the settlement agreement is dispositive, we need not address the other elements of breach of a settlement agreement.

{¶37} Paragraph 5 of the settlement agreement provides, in relevant part, "**5. <u>Payment of Utilities.</u>** [Plaintiffs], jointly and severally, promise to pay all utilities during the Base Possession Period[4] * * *." (Bold and underline sic.) (May 1, 2012 Tr., Defendant's Ex. 5).

{¶38} The parties dispute whether Plaintiffs were required to pay the utility bill by its due date—December 20, 2011. To determine whether Monroe established that Plaintiffs breached the settlement agreement by not paying the utility bill on December 20, 2011, the trial court looked to the language the parties employed in the settlement agreement related to the payment of utilities during the term of the lease. The trial court concluded that the language in Paragraph 5 of the settlement agreement is clear and unambiguous. In particular, the trial court noted that Paragraph 5 of the settlement agreement "provides that the plaintiffs 'promise to pay all utilities during' their possession." (Doc. No. 49, quoting Settlement Agreement at Paragraph 5).

{¶39} Based on that language, the trial court concluded, "There is no requirement that the bills for utilities must be paid by a certain date or within a certain amount of days after being billed, so the plaintiffs can't be said to have failed to perform a specific obligation." (*Id.*). Therefore, the trial court concluded that Plaintiffs did not breach the settlement agreement by paying the utility bill in February 2012. Specifically, the trial court concluded that the late payment of the

---

[4] "Base Possession Period" refers to Plaintiffs' "continuing possession" of the premises until November 30, 2011 under the settlement agreement. (May 1, 2012 Tr., Defendant's Ex. 5).

bill did not constitute a breach of the settlement agreement because Plaintiffs substantially performed and there was no requirement in the settlement agreement that utilities must be paid by a certain time.

{¶40} We conclude that, as the trial court did, Paragraph 5 of the settlement agreement is clear and unambiguous and required Plaintiffs to pay all utilities. The settlement agreement does not specify a date for performance and, "[a]s a general rule, the time for performance is not assumed to be of the essence." *Nippon Life Ins. Co.*, 2011-Ohio-2175, at ¶ 23, citing *Brown v. Brown*, 90 Ohio App.3d 781, 784 (11th Dist.1993). *See also Mays v. Hartman*, 81 Ohio App. 408 (1st Dist.1947), paragraph one of the syllabus ("Unless the nature of the contract makes performance on the exact date of vital importance, or the contract expressly so provides, failure to perform on the day stated does not discharge the duty of the other contracting party.").

{¶41} The trial court's determination that Plaintiffs did not breach the settlement agreement under Paragraph 5 is not against the manifest weight of the evidence. The trial court, which was in the best position to observe the witnesses, concluded that Myron's testimony at the evidentiary hearing that Savoy paid the utility bill as soon as he was aware of it, in addition to a 2.1% late payment, demonstrated that Plaintiffs performed their obligations regarding the payment of utilities under Paragraph 5 the settlement agreement. Therefore, because the trial court's conclusion that Plaintiffs did not breach Paragraph 5 the settlement

agreement is supported by some competent, credible evidence and is not against the manifest weight of the evidence, the trial court did not abuse its discretion in enforcing the settlement agreement with respect to the payment of the utility bill.

{¶42} We next review Monroe's argument that Plaintiffs breached the settlement agreement because they failed to repair and replace items identified by Monroe after its inspection under Paragraph 10 of the settlement agreement. Under the settlement agreement, Plaintiffs agreed to vacate the leased premises by December 1, 2011, and there is no dispute that the Plaintiffs vacated the premises by that date. (*See* Doc. No. 47). After Plaintiffs vacated the premises, Monroe was to inspect the premises, identify any items needing to be repaired or replaced, and notify Plaintiffs of those items. (*Id.*). Monroe inspected the premises and notified Plaintiffs of the items it identified as needing to be repaired or replaced. (*Id.*). However, the parties disputed the items identified by Monroe as needing to be repaired or replaced under Paragraph 10 the settlement agreement, which included:

1. Replacement of all light fixtures and switches;

2. Reinstallation of the wine display, including glass panels, to its original condition;

3. Relocation of the bar back to its original location;

4. Replace any hood ventilation units;

5. Replace any countertops, shelving, cabinetry, casework shadowboxes, and other similar fixates;

6. Replace any walk-in refrigerator or freezer units;

7. Premises were left in filthy condition and need to be returned to broom-clean condition;

8. Replace all ceiling tiles which were removed;

9. Replace dishwasher system;

10. Replace tables in bar area and on patio;

11. Broken water line needs to be fixed, as well as resulting water damage due to broken line being left running;

12. Awnings were removed and need to be replaced;

13. Music System needs to be replaced; and

14. Carpet was removed and needs to be replaced.

(*Id.*); (May 1, 2015 Tr., Defendant's Ex. 6).

**{¶43}** Because the parties disputed whether Plaintiffs' failure to execute all of the repairs or replacements identified in Monroe's inspection list constituted a breach of Paragraph 10 of the settlement agreement, the trial court concluded:

The nub of the current dispute is the parties' inability to agree that the undone items on the inspection list are the plaintiffs' responsibility, so the motion to enforce the settlement agreement is,

in essence, a request for declaratory judgment asking the court to
declare the rights and obligations of the parties under the contract.

(Doc. No. 49). Therefore, instead of interpreting Paragraph 10 of the settlement agreement to determine whether Monroe satisfied its burden of proving that Plaintiffs breached the settlement agreement, the trial court construed Plaintiffs' motion to enforce the settlement agreement, with respect to Paragraph 10, as a motion for declaratory judgment.

**{¶44}** A complaint seeking relief based on a breach of contract may be treated as a claim for declaratory judgment seeking construction of the contract. *See Blackwell v. Internatl. Union, United Auto Workers*, 9 Ohio App.3d 179 (8th Dist.1983), paragraph one of the syllabus. *See also* R.C. 2721.04 ("a contract may be construed by a declaratory judgment or decree either before or after a breach of the contract"). An appellate court reviews a trial court's determination "concerning the appropriateness of the case for declaratory judgment" under an abuse-of-discretion standard. *See Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, ¶ 1. After the trial court determines that a complaint for declaratory judgment presents a justiciable question, an appellate court reviews de novo purely legal issues. *Id.* at ¶ 17.

**{¶45}** "A declaratory judgment action provides a means by which parties can eliminate uncertainty regarding their legal rights and obligations." *Mid-Am. Fire and Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, ¶ 8. *See also*

R.C. 2721.03. "The purpose of a declaratory judgment action is to dispose of 'uncertain or disputed obligations quickly and conclusively,' and to achieve that end, the declaratory judgment statutes are to be construed 'liberally.'" *Mid-Am.* at ¶ 8, quoting *Ohio Farmers Indemn. Co. v. Chames*, 170 Ohio St.3d 209, 213 (1959). However, "the declaratory judgment statutes are not without limitation," and a declaratory judgment should be used "only to decide 'an actual controversy, the resolution of which will confer certain rights or status upon the litigants.'" *Id.*, quoting *Corron v. Corron*, 40 Ohio St.3d 75, 79 (1980).

{¶46} The trial court did not abuse its discretion by construing Plaintiffs' motion to enforce the settlement agreement, with respect to Paragraph 10, as a motion for declaratory judgment because there was a justiciable controversy. That is, determining the rights and obligations of the parties under the settlement agreement with respect to the repairs and replacements identified in Monroe's inspection list would quickly and conclusively terminate the parties' dispute regarding their rights and obligations under Paragraph 10 of the settlement agreement.

{¶47} Based on that conclusion, we review de novo the interpretation of Paragraph 10 of the settlement agreement, which is at the heart of the trial court's declaration of the parties' rights and obligations with respect to the repairs and replacements identified in Monroe's inspection list. Paragraph 10 of the settlement agreement provides, in relevant part:

**10.** <u>**Dismissal of the Lawsuit.**</u> Following the termination of [Plaintiffs'] possession of the Premises. [sic] Monroe [] shall conduct a physical examination of the Premises to determine items of required repair or replacement. *[Plaintiffs] agree to provide at their expense all labor and materials necessary to repair or replace any defective conditions identified in the inspection*, excepting reasonable wear and tear, insured casualty loss or act of god. If [Plaintiffs] fail or refuse to make any such expenditure or perform any such repair or replacement, Monroe [] may seek and secure specific performance through appropriate legal proceeding or may implement such repair, replacement or remediation for which [Plaintiffs] agree, jointly and severally, to reimburse Monroe [] for such costs.

(Bold and underline sic.); (Italics added.) (May 1, 2012 Tr., Defendant's Ex. 5).

**{¶48}** Monroe contends that "Paragraph 10 of the [Settlement] Agreement explicitly provides that Monroe [] alone shall determine what repairs and/or replacements are necessary, and that [Plaintiffs] agree to make such repairs[.]" (Doc. No. 37). Plaintiffs alternatively contend that Monroe was "overreaching in its requested repairs and replacements" identified as defective conditions in its inspection list. (Doc. No. 44).

{¶49} In interpreting the rights and obligations of the parties under the settlement agreement, it appears that the trial court concluded that Paragraph 10 of the settlement agreement is unclear and ambiguous because the trial court concluded that it must be interpreted in conjunction with the lease, landlord agreement, and the landlord rider. In particular, the trial court found that Monroe's

> interpretation, however, ignores the other written agreements between the parties, namely the landlord rider and landlord agreement. [Monroe] was well aware that much of the equipment and other property the plaintiffs brought to the premises were either proprietary to The Melting Pot Restaurants, Inc. or collateral of UPS Business Credit, and there is no evidence that the parties intended to override [Monroe's] lien waivers when they agreed to the settlement.

(Doc. No. 49).

{¶50} We conclude that Paragraph 10's requirement that Plaintiffs "'provide at their expense all labor and materials necessary to repair or replace *any defective conditions* identified in the inspection'" is unclear, indefinite, and reasonably subject to dual interpretations. That Paragraph 10's phrase requiring Plaintiffs to remedy "any defective conditions" is unclear, indefinite, and reasonably subject to dual interpretations is highlighted by the parties' dispute regarding what items Plaintiffs were required to repair or replace under Monroe's

inspection list. *See Sandusky v. Erie Cty. Bd. of Comms.*, 6th Dist. Erie No. E-15-010, 2015-Ohio-2231, ¶ 20 (concluding that a phrase in the parties' agreement was ambiguous because it was reasonably susceptible to dual interpretations); *Money Station, Inc. v. Electronic Payment Serv., Inc.*, 136 Ohio App.3d 65, 71 (1st Dist.1999) (holding that the settlement agreement was ambiguous because "the parties presented arguably supportable, but different, interpretations of the disputed paragraph"). The interpretations advanced by the parties are reasonable—namely, although the plain language of the settlement agreement requires Plaintiffs to remedy *all* defective conditions, simply because an item is identified in the inspection list as a *defective* condition does not automatically mean that it is defective.

{¶51} Thus, because Paragraph 10 of the settlement agreement is ambiguous, the parties' intent relative to what constituted a defective condition must be ascertained. Because the parties' intent relative to Paragraph 10 of the settlement agreement is a question of fact, we will not reverse the trial court's interpretation of the parties' intent so long as its factual determinations are based on some competent, credible evidence. *Am. Servicing Corp.*, 2014-Ohio-3984, at ¶ 15. We conclude that the trial court's factual determinations regarding the parties' intent as to what defective conditions had to be remedied under Paragraph 10 of the settlement agreement are supported by some competent, credible evidence.

{¶52} To explain the intended meaning of Paragraph 10, the parties, as well as the trial court, resorted to extrinsic evidence. In particular, in the inspection report that Monroe provided Plaintiffs on December 16, 2011, Monroe relied on the settlement agreement *and the lease agreement* in support of its list of defective conditions that it determined Plaintiffs were required to remedy. (May 1, 2012 Tr., Defendant's Ex. 6). In their December 19, 2011 response letter to Monroe, Plaintiffs responded that the defective conditions identified in Monroe's inspection report were subject to the landlord agreement and landlord rider. (May 1, 2012 Tr., Defendant's Ex. 7). Accordingly, the trial court took "into account whether the various items [Monroe] wants to be returned or replaced [were] [Monroe's] property under section 6(b) of the lease or were exempted from that section by the landlord rider or landlord agreement." (Doc. No. 49).

With regard to the landlord agreement, the trial court found:

Monroe agreed to the landlord agreement knowing that it was insisted upon by Savoy's lender, UPS Capital Business Credit. The agreement describes UPS's collateral for the loan to Savoy as 'all property' subject to a security agreement between Savoy and UPS, including 'all furniture, removable trade fixtures, removable kitchen equipment, dining tables and booths' and all substitutions for any such equipment. By the agreement, Monroe acknowledged that the collateral 'shall be deemed to be personal property of [Savoy] and

not a fixture or part of the Premises' and agreed to waive any right it might otherwise have as to any of the collateral.

(Footnotes omitted.) (Doc. No. 49, quoting May 1, 2012 Tr., Plaintiffs' Ex. B). And, with respect to the landlord rider, the trial court found:

Monroe agreed to the landlord rider knowing that it was insisted upon by Savoy's franchisor, The Melting Pot Restaurants, Inc. By the rider, at paragraph number 6, Monroe agreed to waive 'lien rights for' 15 categories of Melting Pot equipment or fixtures listed in sub-paragraphs 6(a) through 6(o). [Myron] summarized this list as items that are 'proprietary' to The Melting Pot, many of which bore a Melting Pot logo.

(Footnote omitted.) (*Id.*, quoting May 1, 2012 Tr., Plaintiffs' Ex. A).

**{¶53}** The trial court individually analyzed Monroe's requested repairs and replacements and determined whether Plaintiffs were required to execute that repair or replacement under Paragraph 10 of the settlement agreement. Specifically, the trial court addressed in detail each of the 14 items requested to be repaired or replaced against the lease agreement, landlord agreement, and landlord rider, and ordered Plaintiffs to effect the repairs or replacements required by the lease agreement and settlement agreement that were not completed or restricted by the landlord agreement or landlord rider.

-26-

{¶54} In particular, the trial court concluded that Plaintiffs did not need to repair or replace items 5, 6,[5] 9, and 10 as requested by Monroe because they were exempted by the landlord agreement or landlord rider. (Doc. No. 49). The trial court concluded that evidence was presented at the evidentiary hearing that Plaintiffs completed items 2, 3, and 4 of Monroe's inspection list and that there was insufficient evidence presented that Plaintiffs needed to complete items 8 and 11. (*Id.*). The trial court ordered Plaintiffs to repair or replace the light switches as indicated by item 1 of Monroe's inspection list as well as items 12 and 13, and Plaintiffs conceded that they would replace the light fixtures in the "lovers' lane" portion of the leased premises. (*Id.*). Finally, the trial court ordered Plaintiffs to clean the premises and described the cleaning that should be accomplished. (*Id.*).

{¶55} The landlord agreement was executed between Monroe and Plaintiffs' lender, UPS Capital Business Credit, in relation to the lease executed between Plaintiffs and Monroe. (May 1, 2012 Tr., Plaintiffs' Ex. B). The landlord agreement states that it covers, in part,

 all property (the "Collateral") which is subject to the Security

 Agreement between [Plaintiffs] and the Lender including but not

 limited to all furniture, removable trade fixtures, removable kitchen

 equipment, dining tables and booths (including fondue cooking

 equipment) located in the Premises, as well as all substitutions,

---

[5] While the trial court concluded that Plaintiffs did not need to repair or replace the walk-in refrigerator or freezer unit, it ordered Plaintiffs to fully remove the remaining portions of the unit. (Doc. No. 49).

accessions, replacements thereto that is [sic] now owned or hereafter acquired by [Plaintiffs.] * * * But for purposes of this Agreement, the term Collateral does not include any item of personal property that is now or hereafter permanently affixed to the Premises; or if [Plaintiffs] removes from the Premises any trade fixture or equipment owned by [Monroe] that are identified on Schedules A through G attached hereto as "on premises" and replaces that removed fixture or equipment "the replacement fixture or equipment"; any components of HVAC, plumbing and similar systems now or hereafter serving the Premises. * * *

[Monroe] and Lender hereby covenant and agree as follows:

2. [Monroe] consents to the location of the Collateral at the Premises and acknowledges that, at all times, the Collateral shall be deemed to be personal property of [Plaintiffs] and not a fixture or part of the Premises;

3. [Monroe] hereby subordinates, waives and releases any claim, right, title or lien in the Collateral, which Landlord now has or may hereafter acquire, either by statute, agreement or otherwise;

* * *

6. Subject to the rights of The Melting Pot Restaurants, Inc., [Monroe] consents to an assignment of the Lease by [Plaintiffs] to Lender * * *.

(*Id.*)

**{¶56}** The landlord rider, which was executed simultaneously with the lease, was executed by Plaintiffs and Monroe and describes the rights of the franchisor, The Melting Pot Restaurants, Inc., under the lease between Plaintiffs and Monroe. (May 1, 2012 Tr., Plaintiffs' Ex. A). In particular, it states,

> By entering into a franchise relationship with the Franchisor, [Plaintiffs] has [sic] agreed to grant the Franchisor a security interest in the Lease, all of the furniture, removable trade fixtures, kitchen equipment dining tables and booths (including fondue cooking equipment), lamps and lighting fixtures, inventory, licenses and supplies located in the Premises as collateral for: (a) the payment of any obligation, liability or other amount owed by the Tenant or its affiliates to [Monroe] arising under the Lease; (b) any default or breach of any of the terms and provisions of the Lease; and (c) for any default or breach of any of the terms and provisions of the Franchise License with the Franchise License. * * *
>
> 6. **<u>Waiver of Landlord's Lien.</u>** [Monroe] waives lien rights for the following items to the Franchisor:

(a) **Bottle Light Fixtures** – Either wall mounted, inset or hanging.

* * *

(j) **Signage** – Any type of signage, interior or exterior, bearing in any form The Melting Pot® logo, name or insignia.

(k) **Branded Items, Menus and Point of Sale Materials** – Any item bearing in any form The Melting Pot® logo, name or insignia, including: Dinner, Dessert and Souvenir Menus, wine lists; table tent; check presenters; matches; napkins; glassware; welcome mats; mints; sugar packets, etc.

* * *

9. **Amendment.** [Monroe] and [Plaintiffs] will not cancel, terminate, modify or amend the Lease including, without limitation, Franchisor's rights under this Rider, without the Franchisor's prior written consent * * *.

(Emphasis sic.) (*Id.*).

{¶57} At the evidentiary hearing, Myron testified about the items Monroe identified as needing repaired or replaced in its inspection list. (*See* Doc. No. 49 at 4). Myron testified that items 2, 3, 4, and 8 of Monroe's inspection list were completed. (May 1, 2012 Tr. at 100). With regard to the ceiling tiles, Myron testified that "any ceiling tiles that were removed, they were replaced." (*Id.* at 64). Myron testified that he was unaware of a broken water line as alleged by Monroe

under item 11. (*Id.* at 53, 55-56, 65, 101, 131, 135). He also testified that no countertops were removed as indicated by item 5. (*Id.* at 57, 101, 132)

**{¶58}** Myron conceded that Plaintiffs would replace the light fixtures in "lover's lane." (*Id.*). He further conceded that Plaintiffs would repair or replace light switches identified in item 1 so long as "they are not propriety in nature." (*Id.* at 128-129). In regard to the carpet identified in item 14, Myron testified that Plaintiffs did not remove any carpet, but conceded that "[i]f there was an area under a table that needed to have a patch or something put down to get this case resolved, [Plaintiffs] were willing to do that." (*Id.* at 71, 102). Lastly, Myron conceded that Plaintiffs needed to clean the premises as indicated in item 7. (*Id.* at 64, 100, 128).

**{¶59}** Myron's testimony also highlighted that items 6, 9, 10, 12, and 13 were exempted by the landlord agreement or the landlord rider. (*Id.* at 61-62, 64-66, 69, 102-104, 132). However, Myron acknowledged that, although Plaintiffs removed the walls, the door, and the ceiling of the walk-in refrigerator, the bottom portion of the walk-in refrigerator identified in item 6 remained at the premises. (*Id.* at 61). Myron also acknowledged that items, including green and white awnings and a music system, from previous tenants were discarded. (*Id.* at 67-69).

**{¶60}** Monroe did not provide any testimony at the evidentiary hearing. Instead, Monroe submitted photographic evidence depicting the condition of the premises. (*See* May 1, 2012 Tr., Defendant's Exs. 10-25).

{¶61} Therefore, these facts and circumstances constitute some competent, credible evidence regarding the parties' intent as to what defective conditions were required to be remedied by Plaintiffs under Paragraph 10 of the settlement agreement.

{¶62} Nevertheless, Monroe maintains that the trial court abused its discretion by enforcing the settlement agreement after concluding that Monroe did not satisfy its burden of proving that Plaintiffs breached Paragraph 10 of the settlement agreement. It is undisputed that Plaintiffs completed the items that the trial court ordered it to repair or replace. (Appellant's Brief at 21); (Appellee's Brief at 4); (Doc. No. 66). Because it is undisputed that Plaintiffs complied with the terms of Paragraph 10, Plaintiffs as a matter of law did not breach Paragraph 10 of the settlement agreement. Because Plaintiffs did not breach Paragraph 10 of the settlement agreement as a matter of law, we need not address the other elements of breach of a settlement agreement. Thus, the trial court did not abuse its discretion in enforcing the settlement agreement with respect to Plaintiffs' actions under Paragraph 10.

{¶63} Therefore, because Monroe did not satisfy its burden of proving that Plaintiffs breached Paragraphs 5 and 10 of the settlement agreement, the trial court did not abuse its discretion by granting Plaintiffs motion to enforce the settlement agreement. Monroe's first assignment of error is overruled.

{¶64} In its third assignment of error, Monroe argues that the trial court erred by denying its motion to enforce the settlement agreement and mutual release. Although the caption of Monroe's third assignment of error states that it is assigning as error the trial court's denial of Monroe's motion to enforce the settlement agreement and mutual release, Monroe is essentially arguing that, based on the arguments presented in its brief, the trial court erred in ordering it to return Plaintiffs' security deposit after erroneously interpreting the settlement agreement and erroneously concluding that Plaintiffs did not breach the settlement agreement. Specifically, Monroe argues that the mutual release, which is attached to the settlement agreement, releases Monroe from any claims not asserted by Plaintiffs—namely, that the mutual release extinguishes Plaintiffs' claim to the security deposit. As such, we will address whether the trial court erred in ordering Monroe to return Plaintiffs' security deposit in light of the mutual release.

{¶65} Based on our holding in Monroe's first assignment of error, we need to address only whether, in light of the mutual release, the trial court erred in ordering Monroe to return Plaintiffs' security deposit, which, as a matter of contract interpretation, we review de novo.

{¶66} We conclude that the trial court did not err in ordering Monroe to return Plaintiffs' security deposit based on the clear and unambiguous language of the settlement agreement with respect to the mutual release. In particular, the settlement agreement states, with respect to the mutual release, "Simultaneously

with the execution of the Stipulation of Dismissal With Prejudice, the Parties shall execute a Mutual Release, in the form attached as Exhibit B." (*See* May 1, 2012 Tr., Defendant's Ex. 5). The language of the settlement agreement with respect to the mutual release clearly and unambiguously states that the mutual release will be executed simultaneously with the "Stipulation of Dismissal With Prejudice." There is no evidence in the record that the parties executed the "Stipulation of Dismissal With Prejudice" or the mutual release. "[C]ourts will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both.'" *Artisan Mechanical, Inc. v. Beiser*, 12th Dist. Butler No. CA2010-02-039, 2010-Ohio-5427, ¶ 33, quoting *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Oho St.2d 147, 151-152 (1978). Therefore, since there is clear evidence that the parties did not intend to be bound by the mutual release until they executed the "Stipulation of Dismissal With Prejudice," the trial court did not err in ordering Monroe to return Plaintiffs' security deposit. As such, the trial court did not err by denying Monroe's motion to enforce the settlement agreement. Monroe's third assignment of error is overruled.

### Assignment of Error No. II

**The Trial Court Erred When It Denied Appellant's Motion for Attorney Fees.**

{¶67} In its second assignment of error, Monroe argues that the trial court erred when it denied its motion for attorney fees stemming from Plaintiffs' breach of the settlement agreement. Specifically, Monroe argues that it is entitled to $19,740.00 in attorney fees it incurred from Plaintiffs' failure to comply with their obligations under the settlement agreement.

{¶68} "The decision to award attorney fees and the amount thereof are within the discretion of the trial court." *Technical Constr. Specialties, Inc. v. New Era Builders, Inc.*, 9th Dist. Summit No. 25776, 2012-Ohio-1328, ¶ 26, citing *Cassaro v. Cassaro*, 50 Ohio App.2d 368, 373-374 (8th Dist.1976). *See also Raymond J. Schaefer, Inc.*, 2010-Ohio-4714, at ¶ 34 ("the trial court's decision to award attorney fees should not be reversed absent an abuse of discretion"), citing *Brittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991).

{¶69} "Attorney fees are generally not recoverable in contract actions." *Technical Constr. Specialties, Inc.* at ¶ 26, citing *First Bank of Marietta v. L.C. Ltd.*, 10th Dist. Franklin No. 99AP-304, 1999 WL 1262058, *8 (Dec. 28, 1999). "Such a principle comports with the 'American Rule' that requires each party involved in litigation to pay its own attorney fees in most circumstances." *Id.*, citing *Sorin v. Bd. of Edn.*, 46 Ohio St.2d 177, 179 (1976). "As exceptions to that rule, recovery of attorney fees may be permitted if (1) a statute creates a duty to pay fees, (2) the losing party has acted in bad faith, or (3) the parties contract to shift fees." *Id.*, citing *McConnell v. Hunt Sports Ents.*, 132 Ohio App.3d 657, 699

(10th Dist.1999), citing *Pegan v. Crawmer*, 79 Ohio St.3d 155, 156 (1997). "[A] party may receive attorney fees resulting from the other party's breach of the settlement agreement as a form of compensatory damages." *Raymond J. Schaefer, Inc.* at ¶ 34, citing *Tejada-Hercules v. State Auto. Ins. Co.*, 10th Dist. Franklin No. 08AP-150, 2008-Ohio-5066, ¶ 10 and *Shanker v. Columbus Warehouse Ltd. Partnership*, 10th Dist. Franklin No. 96APE09-1269, 1997 WL 142723 (Mar. 31, 1997).

**{¶70}** Because we determined in Monroe's first assignment of error that the trial court did not err in concluding that Plaintiffs did not breach the settlement agreement, no exceptions to the American rule permitting the recovery of attorney fees apply. Therefore, the trial court did not abuse its discretion by denying Monroe's motion for attorney fees. Monroe's second assignment of error is overruled.

**{¶71}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW and WILLAMOWSKI, J.J., concur.**

**/hlo**

Judges Stephen R. Shaw, Vernon L. Preston and John R. Willamowski from the Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.