[Cite as *Aceste v. Stryker Corp.*, 2020-Ohio-4938.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Frank Aceste, et al.                         Court of Appeals No. L-19-1166

      Appellants                         Trial Court No. CI0201504798

v.

Stryker Corporation, et al.            **DECISION AND JUDGMENT**

      Appellees                         Decided:  October 16, 2020

* * * * *

Karin L. Coble, for appellants.

Susan M. Audey and Tariq M. Naeem, for appellees, Stryker Corporation
and Howmedica Osteonics Corp.

Paul C. Cosgrove and Joshua A. Klarfeld, and Georgia Hatzis, for appellee,
Hammill Manufacturing Company.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellants, Frank and Rhonda Aceste, appeal the judgment of the Lucas

County Court of Common Pleas, dismissing with prejudice appellants' claims against

appellees, Stryker Corporation, Howmedica Osteonics Corporation, and Hammill Manufacturing Company. For the reasons that follow, we reverse.

## I. Facts and Procedural Background

{¶ 2} The present matter was initiated on December 11, 2015, when appellants filed a complaint against appellees for compensatory damages related to medical problems and loss of consortium. The case was subsequently consolidated with another pending case involving a separate plaintiff. Relevant here, the claims were mediated over numerous sessions beginning in June 2016.

### A. Trial Court Grants Appellees' Motion to Enforce Settlement Agreement

{¶ 3} On April 10, 2017, appellees moved to enforce a settlement agreement that was purportedly reached during the mediation sessions. In their motion, appellees asserted that on September 30, 2016, counsel for appellants, Zoll & Kranz, LLC, sent correspondence to appellees confirming that appellants, among others, agreed to the settlement terms, including appellees' payment of a sum of money to appellants, dismissal of the lawsuit with prejudice, release of all present and future claims against appellees, appellants' responsibility for Medicare liens, and strict confidentiality and non-disparagement. Appellees also asserted that Zoll & Kranz indicated, in the September 30, 2016 correspondence, that as part of the informed consent process, appellants were provided with an explanatory form to review the terms of the settlement.

{¶ 4} The September 30, 2016 correspondence was not so specific regarding the settlement terms, however. The correspondence stated, in its entirety,

2.

We have reached at least some conclusion with all remaining [redacted] clients.

As you know, we allocated the offer with the assistance of Special Master Judge Richard B. McQuade. Their responses can be broken into 3 categories:

Group A

[Redacted] people have accepted the allocated offer. [Redacted] of those have returned a signed form and we are still waiting on the remaining [redacted]. The total amount allocated to these [redacted] was [redacted].

Group B

[Redacted] people, [redacted] and [redacted] have accepted the allocated offer contingent on resolution of their liens such that they do not have to pay any subrogation. Both live in "made-whole" states where subrogation is not due until the client has been made whole and we have sent letters to both subrogation carriers demanding that they waive their liens. The total amount allocated to these [redacted] is [redacted].

Group C

[Redacted] people, [redacted] and [redacted], have rejected the allocated offer. The total amount allocated to these [redacted] was [redacted].

3.

If you feel it would be helpful, we could provide Judge Welsh a copy of the Special Master's letter to the clients with the spreadsheet showing each allocation and the bases for it. While the material is confidential and privileged, we hope that she will determine that Judge McQuade's allocation was done fairly.

While we are still working to secure final signed acceptance as well as aggressively pursuing the lien resolution issue on behalf of [redacted] clients, we have essentially reached what we feel is fairly (sic) optimistic point. We recognize there are a few contingent issues on behalf of our clients and we are mindful that is not precisely what Stryker was seeking. I welcome input on direction or next steps from this point.

**{¶ 5}** The next email, chronologically, that appellees attached to their motion to enforce the settlement agreement was a November 23, 2016 email wherein Zoll & Kranz sent to appellees their proposed Qualified Settlement Fund agreement ("QSF") and proposed Medicare and Non-Medicare releases. On November 28, 2016, appellees replied with their proposed changes to the QSF and to the releases, and stated that if the documents were acceptable, then appellees would need a list of the individuals categorized into Medicare and Non-Medicare. On November 29, 2016, Zoll & Kranz approved the documents and sent to appellees a list of the Medicare status for all settled individuals for purposes of determining the correct release language. Appellants were included on this list. Appellees then requested a list of the actual settlement proceeds

4.

allocated to each person. In response, a second list identifying the settled individuals with their settlement allocations was sent to appellees on November 30, 2016. Again, appellants were included on the list.

{¶ 6} Based on the representations of Zoll & Kranz, appellees prepared the individualized "Confidential Settlement Agreement and Full Release," which appellees claim memorialized the basic settlement terms to which the parties had already agreed. This release was sent to Zoll & Kranz on December 5, 2016, and was attached to appellees' motion to enforce the settlement agreement as Exhibit D. The December 5, 2016 "Confidential Settlement Agreement and Full Release" is the first document that details any of the terms of the settlement agreement. Appellants did not sign the December 5, 2016 "Confidential Settlement Agreement and Full Release."

{¶ 7} Also attached to appellees' motion to enforce the settlement agreement were several email chains discussing appellants' unwillingness to sign the "Confidential Settlement Agreement and Full Release." On January 12, 2017, Zoll & Kranz advised appellees that appellants had raised an issue with the portion of the "Confidential Settlement Agreement and Full Release" language pertaining to Medicare. On January 27, 2017, Zoll & Kranz provided appellees with proposed edits to the release which removed the Medicare provisions, but specifically noted "We do not have client consent but we at least wanted to give you a draft to consider." A further email from Zoll & Kranz on that date reiterated "But please bear in mind I have not yet been able to get the client on board. Very difficult situation, even though he previously had agreed in

5.

writing." On January 30, 2017, Zoll & Kranz contacted appellees to inquire on their response to the proposed changes to the Medicare provisions, but again noted, "We do not yet have client consent yet * * * * We hope that if the client accepts, we can quickly get the final agreement to him for signature." Appellees responded that they agreed to the proposed edits, but to "keep [them] posted." On February 3, 2017, Zoll and Kranz advised appellees that they were sending the finalized release to appellants. The February 3, 2017 "Confidential Settlement Agreement and Full Release" was attached to appellees' motion to enforce the settlement agreement as Exhibit H. Appellants have at all times refused to sign either the December 5, 2016, or the February 3, 2017 "Confidential Settlement Agreement and Full Release." On March 2, 2017, Zoll & Kranz moved to withdraw as counsel.

{¶ 8} In their motion to enforce the settlement agreement, appellees argued that appellants' "words, deeds, and acts establish that the parties had a meeting of the minds as to the essential terms of a settlement agreement," which were acceptance of a settlement in an agreed-upon amount in exchange for a dismissal of appellants' lawsuit with prejudice and a release of their claims. Appellees further argued that appellants' agreement to the terms of the settlement was corroborated by the fact that appellants only contested the Medicare release language in the December 5, 2016 "Confidential Settlement Agreement and Full Release." Thus, appellees concluded that a valid settlement agreement existed that should be enforced by the trial court.

6.

{¶ 9} Appellants responded by filing a pro se motion to vacate the motion to enforce the settlement agreement. In their motion, appellants first argued that Rhonda Aceste never agreed to the settlement, was not aware of any explanatory form regarding the terms of the settlement agreement, never spoke with anyone from Zoll & Kranz's office, and never signed an informed consent letter.

{¶ 10} Additionally, appellants argued that while Frank Aceste signed an "Informed Consent Acknowledgment and Consent to Settle" form on November 2, 2016, he only did so after much pressure from counsel, and while he was mentally incapacitated by pain. Furthermore, appellants contended that Frank was told by counsel that signing the informed consent form was the only way that he could learn the terms of the settlement, and that he would still have a right to decline the settlement once the full terms were disclosed.

{¶ 11} The informed consent form, which was attached as an exhibit to appellants' motion to vacate, stated, in pertinent part:

> I have read and understand the terms of the foregoing letter regarding the aggregate settlement offer being made to 22 clients of Zoll & Kranz, LLC, including myself as well as the allocation of the funds among the clients. I have also spoken to my attorneys and their staff on numerous occasions leading up to this settlement and have been well-informed during these communications.

7.

I accept the terms outlined in the letter, the *Gross Individual Settlement Amount*, and my settlement allocation of * * *.[1]  I understand that this is an estimate and my *Net Individual Settlement Amount* will be the final settlement amount that will be distributed to me after confirmation of the Settlement Criteria listed below, deductions for contingency attorney's fees, litigation costs, as well as any healthcare liens that are deducted from the "*Gross Individual Settlement Amount.*"

* * *

I agree to the appointment of Judge Richard B. McQuade to resolve any disputes that may arise in connection with this Settlement, including the allocation of settlement proceeds.

Notably, the "foregoing letter" that was referred to in the informed consent form, and that contained the terms of the settlement agreement, was not included in the documents presented to the trial court in the litigation on the motion to enforce the settlement agreement.

{¶ 12} Finally, appellants argued in their motion to vacate that the final December 5, 2016 "Confidential Settlement Agreement and Full Release" that Frank refused to sign was drastically different from the original informed consent form that he signed on November 2, 2016.

---

[1] The specific dollar amount of appellant's settlement allocation was included in the informed consent letter, but is omitted here for purposes of confidentiality.

8.

{¶ 13} For all of the above reasons, appellants requested that the court vacate the motion to enforce the settlement agreement, require appellees to provide all medical records and study results relating to Frank, and allow appellants additional time to find suitable counsel.

{¶ 14} Attached to appellants' motion to vacate was, inter alia, an email exchange between Frank Aceste and Zoll & Kranz. The email exchange evidences that counsel was communicating to appellants that appellants could still opt out of the settlement agreement as of late December 2016, well after Zoll & Kranz informed appellees that appellants had agreed to the terms of the settlement. On December 28, 2016, counsel emailed Frank and updated him on the need for an "MSA" (Medicare Medical Savings Account), and suggested hiring a third-party expert to conduct an MSA analysis. If an MSA was needed, it would reduce the amount of the settlement offer that Frank would receive. At the end of the email, counsel posed the following conundrum: "we cannot push forward with an MSA analysis until we know if you are going to accept the offer…and I imagine you don't know if you're accepting the offer until you know how the analysis will turn out." On January 5, 2017, Frank replied, and indicated that he could not make a decision without more information, or without certain assurances. Zoll & Kranz replied on January 6, 2017, that, to clarify, the choice was:

> [W]e either opt in to the current settlement program, or opt out. * * * If
> you opt out, then our task is to return to fighting your case in court. If
> Stryker decides to settle the other 19 people without you (their option), then

9.

they may approach you about settling on other terms (maybe we could ask them to pay the MSA). Then again, when we only have 2 cases left (I have one other person who opted-out months ago), then they may refuse any more settlement talks and we'll prepare for trial over the next 18-24 months.

On January 11, 2017, Frank emailed counsel to inform them that "I have decided to opt out of the settlement agreement and to continue litigation." After a further email from Zoll & Kranz attempting to salvage the settlement agreement, Frank replied on January 12, 2017,

The MSA, which was brought to light with the final settlement docs, has raised some issues I had not thought of earlier.

This settlement is unacceptable regardless of MSA and I will take my chances.

[Appellees] should have disclosed the full settlement details from the start.

{¶ 15} Also attached to appellants' motion to vacate was a December 13, 2016 email from Zoll & Kranz to Frank's sister, Claire Aceste. The email explained,

Regarding the original offer including 22 people, but now only 20: Stryker did make their original offer contingent on all 22 people accepting. Back then, first one person said "no" and we called Stryker and asked if we should even continue our work. They said "please continue," which we

10.

took to mean that they would proceed without one person. Then, when I asked for final answers from the last 4 people (Frank was one of those last 4, as I recall), one more person said "no." Everyone else said "yes." Then, Stryker considered whether they wanted to go forward for the 2 months that followed…and very recently came back and said they would go forward with the 20 of 22.

{¶ 16} On June 27, 2017, appellees filed their reply in support of their motion to enforce the settlement. In their reply, appellees reiterated that appellants' words, deeds, and acts as conveyed through their counsel established a meeting of the minds as to the essential terms of the settlement agreement. Appellees argued that this reality is conclusively supported by the signed informed consent letter, in which Frank acknowledged that he understood the terms of the agreement, that he was aware that the gross settlement amount was subject to a series of deductions, and that he accepted the settlement.

{¶ 17} On August 21, 2017, the trial court entered its judgment granting appellees' motion to enforce the settlement agreement. The trial court reasoned that the informed consent form signed by Frank on November 2, 2016, evidenced the satisfaction of the essential terms of contract formation, namely offer, acceptance, consideration, and manifestation of mutual assent. The court further found that there was no evidence in the record to support appellants' claim that Frank's signature on the informed consent form

was the product of mental incapacity or undue influence. Thus, the court held that a binding settlement agreement existed.

{¶ 18} As to Rhonda's claim for loss of consortium, the trial court found that such a claim is a derivative claim that cannot survive if the main claim at issue is dismissed. Thus, the court held that Rhonda's claim was no longer enforceable, and that it was subject to the settlement agreement.

{¶ 19} Finally, the court held that even if the informed consent form did not establish that a settlement agreement existed, an agreement nonetheless materialized when appellants presented a counter-offer to appellees—that included changes to the Medicare language—which appellees accepted when they agreed to the modified language.

### B. Appellants Initiate Repeated Challenges to the Trial Court's Judgment Granting the Motion to Enforce the Settlement Agreement

{¶ 20} On September 26, 2017, appellants appealed the trial court's judgment granting the motion to enforce the settlement agreement. On December 6, 2017, this court dismissed appellants' appeal for lack of a final appealable order.

{¶ 21} In the meantime, appellants filed a pro se motion to stay the trial court's August 21, 2017 judgment. In their motion, appellants argued that Frank suffered from diminished mental capacity, as evidenced by an attached listing of the prescription drugs he takes, as well as notes from his psychiatrist relating the treatments and effects Frank has experienced. Appellants further argued that extreme pressure from counsel was placed upon Frank to induce him to sign the informed consent form. Finally, appellants

12.

argued that their prior counsel failed to look into Frank's medical situation, and that appellants have requested, but have not obtained, all of Frank's records held by appellees.

{¶ 22} Notably, attached to appellants' motion to stay was a December 6, 2016 letter from counsel to appellants that accompanied the December 5, 2016 "Confidential Settlement Agreement and Full Release."[2] In the letter, counsel stated that they had been waiting to hear if appellees would go forward with the settlement with only 20 of the 22 claimants agreeing to the settlement, and that counsel was now happy to report that appellees had "agreed to go forward with the settlement." Further, the letter stated that "Stryker has made its revised offer contingent on all 20 people accepting the final terms. If any of the 20 clients does not finalize the settlement, then the offer is withdrawn as to all clients."

{¶ 23} Appellees filed their opposition to appellant's motion to stay, and included a motion to amend the trial court's August 21, 2017 judgment to set forth the parties' respective obligations in light of the court's decision to grant the motion to enforce the settlement agreement. Appellees requested that the court amend its entry to order appellants to execute the "Confidential Settlement Agreement and Full Release" setting forth the terms of the settlement agreement and dismissing the claims with prejudice. While not explicit, appellees referred to the December 5, 2016 "Confidential Settlement Agreement and Full Release" in their motion to amend.

---

[2] Later, the record reveals that the December 6, 2016 correspondence also included a "Revised Informed Consent" form, although that form was not attached to appellants' motion to stay.

13.

{¶ 24} Appellants then filed their reply in support of their motion to stay. In the reply, appellants argued that the September 30, 2016 email chain relied upon by appellees in their motion to enforce the settlement agreement did not support the existence of a settlement agreement. Additionally, appellants asserted that there was never oral or written discussion on the issue of dismissal with prejudice, and thus that term was not part of the original settlement offer. Lastly, appellants stated that there was never acceptance of the settlement offer, that they had the understanding that they still had the choice to opt out of the settlement agreement, that the purported counter-offer from appellants was not accepted by appellees because they only agreed to three of the seven proposed changes, and that Frank's mental illness precluded him from being able to enter into the settlement agreement.

{¶ 25} Following our mandate dismissing appellants' appeal for lack of a final appealable order, appellants filed a pro se motion for a temporary restraining order and preliminary injunction. Although not entirely clear, in their motion for a temporary restraining order, appellants appeared to request that the court prohibit any further litigation on appellees' motion to enforce the settlement agreement because the settlement agreement was negotiated on behalf of appellees by an attorney who is not licensed to practice law in Ohio.

{¶ 26} Appellees responded, arguing that appellants' motion was frivolous, and that any litigation appellees participated in, including the motion to enforce the settlement agreement, was properly brought by Ohio-licensed counsel.

14.

{¶ 27} Appellants replied in support of their motion for a temporary restraining order, and also filed an opposition to appellees' October 23, 2017 motion to amend the trial court's August 21, 2017 judgment entry. As to the opposition to the motion to amend, appellants argued that the motion was untimely pursuant to Lucas County Court of Common Pleas Local Rule 5.05(C) and (D).

{¶ 28} On May 16, 2018, the trial court entered its judgment denying appellants' pro se motion to stay the judgment and pro se motion for a temporary restraining order, and granting appellees' motion to amend the August 21, 2017 judgment. The trial court reasoned that appellants' motion to stay was moot by virtue of the fact that the August 21, 2017 judgment was determined not to be a final appealable order. Further, to the extent that appellants argued that the trial court's judgment on the motion to enforce the settlement agreement was erroneous, the trial court found that appellants' arguments were the same as in its opposition to the motion to enforce and the court found them to be unpersuasive. As to appellants' motion for a temporary restraining order, the trial court found the motion to be without merit because all of the litigation in the case had been conducted on behalf of appellees by an attorney licensed in Ohio. Finally, as to appellees' motion to amend the August 21, 2017 judgment entry, the trial court agreed, and in an effort to enter a final appealable order, the trial court ordered:

> Both Plaintiffs and Defendants herein are hereby ordered to execute
> the Confidential Settlement Agreement and Full Release and Joint
> Dismissal and undertake their respective obligations contained within such

15.

document(s). Furthermore, the parties are ordered to provide this Court with a stipulated dismissal of all Plaintiffs' claims, with prejudice, by Friday, June 1, 2018, at 4:30 p.m.

The trial court did not specify whether the parties were to execute the December 5, 2016, or the February 3, 2017 "Confidential Settlement Agreement and Full Release."

{¶ 29} Shortly before the deadline, on May 31, 2018, appellants filed a "Proposed Settlement Agreement and Dismissal" with the trial court. In their filing, appellants asserted that they submitted a "General Release and Confidential Settlement Agreement" to appellees, but that appellees have not executed the submitted agreement. Strikingly, in the copy of the agreement that appellants submitted with their motion, appellants included a provision that appellees pay an amount approximately 75 times more than the settlement amount contained in the original proposed settlement agreement.

{¶ 30} On June 1, 2018, appellees filed a motion to dismiss appellants' complaint with prejudice, arguing that appellants have failed to comply with the terms of the trial court's May 16, 2018 judgment, and have attempted to extort appellees to settle their claims.

{¶ 31} Before the trial court could rule on appellees' motion to dismiss, appellants appealed the court's May 16, 2018 judgment entry ordering them to execute the "Confidential Settlement Agreement and Full Release."

{¶ 32} Thereafter, appellants filed their opposition to appellees' motion to dismiss, and a pro se motion for reconsideration of the trial court's August 21, 2017 judgment

16.

granting the motion to enforce the settlement agreement. In their filing, appellants attached, for the first time, the "Revised Informed Consent" form sent to appellants by Zoll & Kranz as part of the December 6, 2016 correspondence. Appellants alleged that the "Revised Informed Consent" form—which they refused to sign—contains fraudulent statements by appellees as well as by Zoll & Kranz. Thus, appellants requested the court to reconsider its granting of appellees' motion to enforce the settlement agreement, and deny appellees' motion to dismiss.

{¶ 33} On July 19, 2018, this court dismissed appellants' appeal of the trial court's May 16, 2018 judgment entry for lack of a final appealable order.

{¶ 34} Subsequently, on November 8, 2018, the trial court entered an order reaffirming that appellants' complaint against appellees has been settled pursuant to the terms of the settlement agreement that was attached to appellees' motion to enforce the settlement agreement. This time the trial court ordered appellants to execute the February 3, 2017 "Confidential Settlement Agreement and Full Release," and warned them that if they failed to do so within 21 days, then the court would grant appellees' motion to dismiss, and would dismiss the complaint with prejudice.

{¶ 35} Appellants appealed the trial court's November 8, 2018 judgment entry, which this court again dismissed for lack of a final appealable order.

{¶ 36} On January 4, 2019, following our dismissal of the most recent appeal, the trial court again ordered appellants to execute the "Confidential Settlement Agreement and Full Release," but did not specify whether they should execute the December 5,

17.

2016, or the February 3, 2017 version. The court notified appellants that if they failed to do so within ten days, appellees' motion to dismiss would be granted, and appellants' complaint would be dismissed with prejudice.

{¶ 37} Ten days later, on January 14, 2019, appellants filed a pro se Civ.R. 60(B) motion for relief from judgment, arguing that Frank underwent a surgery on December 7, 2018, that uncovered new evidence in support of appellants' claims against appellees.

{¶ 38} Appellees opposed the motion, arguing that relief from judgment under Civ.R. 60(B) is inappropriate because no final judgment had been entered. To that end, appellees again requested that the trial court dismiss the complaint with prejudice, noting appellants' flagrant refusal to comply with the trial court's order to execute the "Confidential Settlement Agreement and Full Release."

{¶ 39} Appellants then filed their reply in support of their motion for relief from judgment, in which they argued that they did not give "informed" consent to settle because Zoll & Kranz and appellees allegedly failed to disclose pertinent facts and documents at the time of the original settlement negotiations. Appellants further alleged that the original informed consent form that was executed on November 2, 2016, was materially different than the version of the "Revised Informed Consent" form and "Confidential Settlement Agreement and Full Release" that was presented to them on December 6, 2016.

{¶ 40} On May 1, 2019, the trial court entered its judgment denying appellants' motion for relief from judgment. Moreover, the court advised appellants "for the final

18.

time" that if they do not execute the settlement agreement within 20 days, the court will dismiss the complaint with prejudice upon a proper motion by appellees.

{¶ 41} On May 23, 2019, because appellants continued to refuse to sign the "Confidential Settlement Agreement and Full Release," appellees moved to dismiss the complaint with prejudice.

{¶ 42} On June 5, 2019, appellants filed their opposition, in which they raised a number of issues: (1) Rhonda's claim for loss of consortium is still enforceable; (2) appellees' counsel committed the unauthorized practice of law; (3) appellee Hammill Manufacturing was not a party to the motion to enforce the settlement agreement; (4) appellees are in default for failing to file an answer to appellants' complaint; (5) the September 2, 2016 informed consent letter did not contain the material terms of the settlement agreement, including the dismissal of claims with prejudice; (6) the September 2, 2016 informed consent letter and the revised December 6, 2016 informed consent letter state that if any client rejects the offer, then the offer is withdrawn as to all clients; (7) appellants submitted a proposed settlement and dismissal to appellees on May 30, 2018, which received no response; and (8) Frank's mental illnesses and prescription medications impacted his ability to enter into a settlement agreement.

{¶ 43} Attached to the opposition, for the first time, was the full September 2, 2016 letter from Zoll & Kranz to appellants describing the proposed settlement agreement, and requesting appellants' informed consent to the agreement. The letter conveyed that appellees insisted that the settlement offer be accepted by all 22 clients,

19.

and if any client rejects the offer, then it is withdrawn as to all clients. Also included, for the first time, was a portion of the December 6, 2016 letter from Zoll & Kranz to appellants reporting that two people opted out of the original settlement offer, but counsel continued to negotiate and appellees agreed to settle with the remaining 20 clients. Zoll & Kranz again conveyed that "Stryker has made its revised offer contingent on all 20 people accepting the final terms. If any of the 20 clients does not finalize the settlement, then the offer is withdrawn as to all clients."

{¶ 44} Because appellants did not execute the "Confidential Settlement Agreement and Full Release," the trial court, on July 25, 2019, entered its judgment dismissing appellants' complaints with prejudice.

## II. Assignments of Error

{¶ 45} Appellants timely appealed the trial court's July 25, 2019 judgment entry, and filed a pro se appellate brief setting forth 16 assignments of error. Thereafter, appellants were able to retain counsel, and this court permitted counsel to submit a supplemental brief, but this court ordered that counsel was "bound by the assignments of error raised in [appellants'] pro se briefs and may not assert new, additional assignments of error." The 16 assignments of error set forth by appellants are:

> 1. Hundreds of pages of sealed Documents and Exhibits A-M were not provided after the withdrawal of former appellants' attorney's Zoll & Kranz on 3/6/2017.

20.

2. The contents of these Exhibits and Documents, which were in the possession of Zoll & Kranz and were essential to making an informed consent and were not disclosed to appellants before the delayed signing of the informed consent on November 2, 2016.

3. These Exhibits and Documents were belatedly released to Appellants by former Attorney Jim O'Brien, Zoll & Kranz on 6/29/2018.

4. Appellees Stryker et al refused to provide these Exhibits and Documents.

5. The trial court issued a judgment based on untrue allegations presented by Appellees' attorneys without the full understanding of the Appellant Frank A. Aceste mental condition (Exhibit 5 Page 3 of 6 of Plaintiffs' Pro Se Motion to Vacate Stryker's Motion to Enforce Settlement filed 6/16/2017) and (Exhibit A of Appellants' Pro Se Motion for Stay on Judgment filed 10/10/2017) due to an oversight of the trial court's non recognition of proof of Frank's mental incapacity to enter into an agreement due to MDD (Major Depressive Disorder), Anxiety, and the prescription medications' (Effexor, Klonopin, Neurontin, Ambien) side effects on decision making.

6. Frank A. Aceste was coerced into signing the first informed consent, 32 days after the close of the informed consent process, without the presence of his sister (Claire Aceste), acting as advisor due to his

diminished mental capacity. Frank is not capable of making a decision of this magnitude without an advisor as stated by his psychologist and neurologist, Dr. Una Choday MD, PA, records from 2009 through present.

7. The informed consent did not contain a non negotiable offer, acceptance, contractual capacity, or a consideration and was verbally declined and not signed at the Sept. 30, 2016 end of the informed consent process as claimed by Appellee Stryker.

8. Dismissal With Prejudice was never discussed.

9. Frank's wife Appellant Mrs. Rhonda A. Aceste was never even spoken to once by former counsel and did not sign the 1st Informed Consent which Appellee Stryker claims binds Mrs. Rhonda A. Aceste to the supposed settlement agreement.

10. All of Appellants' edits were not agreed to by Appellees and were not just limited to Medicare as Appellees claimed. (only 3 of 7 edits were accepted).

11. In accordance with the Judgment Entry dated 5/17/2018 by Judge Cook, being appealed here, there is included an order to Appellants and Defendants to execute a confidential settlement agreement, full release and joint dismissal and undertake their respective obligations contained within such document(s), however, this did not state which settlement document. Appellants Frank A. Aceste and Rhonda A. Aceste in

22.

compliance with the 5/16/2018 court order, submitted a proposed settlement and dismissal to defendants and the court, filed 5/30/2018, which received no response.

12. Appellant Frank A. Aceste entered into supposed Mediation discussions with Appellee's Stryker (not neutral) Mediator Honorable Diane Welsh, a mediator at JAMS, Inc. arranged by Appellee's attorney Kim Catullo on 2/15/2017. She verbally admitted that not all the edits were accepted as stated by Appellees. In this almost 2 hr. phone call former counsel Jim O'Brien admitted to Mediator Diane Welsh that he told Mr. Frank A. Aceste and his sister Mrs. Claire Aceste (acting as advisor) that the Informed Consent was not final and that we still had the right of refusal to continue litigation. The fact that Appellee Stryker scheduled this mediation is proof that the first informed consent did not contain all the elements necessary for settlement. The contents of the materially different supposed settlement agreement were never disclosed to either Appellants or their former attorney Jim O'Brien before receipt 12/6/2016.

13. Second Revised Informed Consent and First Settlement Agreement and Full Release of 12/6/2016 was not signed and orally rejected and contained fraudulent statements.

14. Second and Third Settlement Agreement and Full Release was not signed and orally rejected and led to mediation phone call with the

23.

Honorable Diane Welsh, Stryker's Appellees Mediator (sic), on 2/15/2017, which resulted in no resolution.

15. Rhonda A. Aceste loss of Consortium is an independent claim that is still enforceable.

16. Unlawful practice of law by Stryker Attorneys Paul Asfendis and Kim Catullo of Gibbons P.C.

### III. Analysis

{¶ 46} At the outset, we note that appellants have not separately argued their assignments of error in their appellate brief, but it is clear that the central issue at dispute is whether a settlement agreement existed between the parties as articulated in appellants' seventh and thirteenth assignments of error.

> The standard of review to be applied to a ruling on a motion to enforce a settlement agreement depends primarily on the question presented. If the question is an evidentiary one, this court will not overturn the trial court's finding if there was sufficient evidence to support such finding. However, in a case such as this one where the issue is a question of contract law, reviewing courts must determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law.

(Internal citations omitted.) *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, 118 N.E.3d 439, ¶ 15 (8th Dist.); *see also Continental W. Condominium Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996) ("[B]ecause

24.

the issue is a question of contract law, Ohio appellate courts must determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law. The standard of review is whether or not the trial court erred.").

{¶ 47} Here, the dispute is not whether the parties breached the terms of the settlement agreement, but rather whether a settlement agreement exists in the first instance. "We review de novo as a question of law a trial court's decision on a motion to enforce settlement of whether a settlement agreement exists as a contract between the parties to terminate a claim by preventing or ending litigation." *Zimmerman v. Bowe*, 6th Dist. Lucas No. L-18-1200, 2019-Ohio-2656, ¶ 11, citing *Marine Max of Ohio, Inc. v. Moore*, 6th Dist. Ottawa No. OT-15-033, 2016-Ohio-3202, ¶ 14; *see also North Side Bank & Trust Co. v. Trinity Aviation, LLC*, 2020-Ohio-1470, --- N.E.3d ---, ¶ 17 (1st Dist.) ("[W]e determine the existence of a contract as a question of law, and our standard of review on questions of law is de novo."); *Alexander Local Sch. Dist. v. Village of Albany*, 2017-Ohio-8704, 101 N.E.3d 21, ¶ 31 (4th Dist.) ("[T]he existence of a contract is a question of law. Therefore, the existence of a contract is a legal conclusion and not a factual allegation."); *Union Sav. Bank v. Lawyers Title Ins. Corp.*, 191 Ohio App.3d 540, 2010-Ohio-6396, 946 N.E.2d 835, ¶ 20 (10th Dist.) ("Courts generally determine the existence of a contract as a matter of law. This court reviews questions of law regarding the existence of a contract de novo."); *Zelina v. Hillyer*, 165 Ohio App.3d 255, 2005-Ohio-5803, 846 N.E.2d 68, ¶ 12 (9th Dist.) ("The existence of a contract is a question of law.").

25.

{¶ 48} Initially, we note that this case would have benefited greatly from a hearing on the motion to enforce the settlement agreement, as is actually required by *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 377, 683 N.E.2d 337 (1997) ("Where the meaning of terms of a settlement agreement is disputed, or where there is a dispute that contests the existence of a settlement agreement, a trial court must conduct an evidentiary hearing prior to entering judgment."). However, because neither appellants nor appellees ever requested a hearing in the trial court, and because appellants did not raise the issue as an assignment of error, the issue is waived. *Wilson v. Wilson*, 2018-Ohio-3820, 111 N.E.3d 110, ¶ 21 (6th Dist.) ("If a trial court does not hold the required hearing, an appellant nonetheless waives this error for purposes of appellate review where '[t]he record shows no indication that appellant requested an evidentiary hearing or objected to the nature of the proceedings.'"). Thus, our review will be limited to whether the evidence presented to the trial court on the motion to enforce the settlement agreement establishes that a settlement agreement did in fact exist.

{¶ 49} "A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* "The burden of proof for each element is by a preponderance of the evidence on the party

26.

seeking to enforce the settlement agreement." *Zimmerman* at ¶ 9, citing *Savoy Hosp., LLC v. 5839 Monroe St. Assocs. LLC*, 6th Dist. Lucas No. L-14-1144, 2015-Ohio-4879, ¶ 26.

{¶ 50} In this case, we find that the evidence does not support the existence of an offer and acceptance forming an oral settlement agreement.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." 1 Restatement of the Law 2d, Contracts (1981), Section 24. An offer is binding on the offeror when accepted by the offeree. An offer remains open for acceptance by the offeree until it is revoked by the offeror, rejected by the offeree, or until the time for its acceptance has expired. *Id.*, Section 36.

When an offer is rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative to bind the offeror. A rejection is implied in a counteroffer, which is "interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on the terms stated in his counteroffer, but by implication that he will not assent to the terms of the original offer." 1 Williston On Contracts (4 Ed. Lord Ed.1990) 631, Section 5:3. An offeree's power to conclude the bargain through his acceptance of the offer is, therefore, terminated by his making of a counteroffer. Restatement, *supra*, Section 39(2).

27.

*Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995).

{¶ **51**} Here, in a December 13, 2016 email to Frank's sister, Zoll & Kranz described the original offer:

> Regarding the original offer including 22 people, but now only 20: Stryker did make their original offer contingent on all 22 people accepting. Back then, first one person said "no" and we called Stryker and asked if we should even continue our work. They said "please continue," which we took to mean that they would proceed without the one person. Then, when I asked for final answers from the last 4 people (Frank was one of those last 4, as I recall), one more person said "no." Everyone else said "yes." Then, Stryker considered whether they wanted to go forward for the 2 months that followed...and very recently came back and said they would go forward with the 20 of 22.

Thus, the original offer required all 22 clients to accept it. This is supported by the September 30, 2016 email, in which Zoll & Kranz relayed that Group A accepted the offer, Group B accepted the offer contingent on the resolution of liens, and Group C rejected the offer. At the end of the email, Zoll & Kranz stated, "We recognize there are a few contingent issues on behalf of our clients and we are mindful *that is not precisely what Stryker was seeking*. I welcome input on direction or next steps from this point." (Emphasis added.) In effect then, the September 30, 2016 email was not an acceptance of

the offer, but rather a counteroffer to settle with less than 22 clients.  The counteroffer constituted a rejection of the original offer, and therefore appellants' purported acceptance of the original offer as evidenced by Frank's November 2, 2016 signing of the informed consent form was ineffective to create a binding settlement agreement.[3]

{¶ 52} Furthermore, appellees December 5, 2016 "Confidential Settlement Agreement and Full Release," cannot be construed to be an acceptance of the counteroffer because in the intervening months, the parties engaged in negotiations resulting in changed language reflected in the December 5, 2016 "Confidential Settlement Agreement and Full Release."  "A reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer." *Foster v. Ohio State Univ.*, 41 Ohio App.3d 86, 88, 534 N.E.2d 1220 (10th Dist.1987), citing 1 Restatement of the Law 2d, Contracts (1981) 144, Section 59.  Therefore, appellees' December 5, 2016 "Confidential Settlement Agreement and Full Release" constituted a further counteroffer, which

---

[3] The dissent asserts that we err by concluding that appellants' acceptance must have occurred on November 2, 2016, or not at all.  The dissent then points to the September 30, 2016 email as evidence that appellants accepted the offer.  First, we note that we do not conclude that appellants must have accepted the offer on November 2, 2016, or not at all.  Rather, we conclude that the November 2, 2016 signing of the informed consent form is evidence of appellants' purported acceptance of the offer.  That purported acceptance, however, was ineffective because the original offer had already been rejected by the September 30, 2016 email.  Second, as discussed above, the September 30, 2016 email was not an acceptance of the offer because the offer was contingent on all 22 plaintiffs accepting, and at least two of the plaintiffs did not accept.  The fact that Frank, individually, was one of the people that initially indicated acceptance of the offer does not create a binding settlement agreement where contingencies related to the offer were not met.

29.

appellants clearly rejected.[4]  Accordingly, we hold that the record does not establish an offer and acceptance forming a binding settlement agreement between the parties.[5]

{¶ 53} Nonetheless, even if we were to find that an offer and acceptance existed, we find that the settlement agreement is unenforceable because the record contains no evidence as to the terms of that agreement.

{¶ 54} "It is preferable that a settlement be memorialized in writing.  However, an oral settlement agreement may be enforceable if there is sufficient particularity to form a binding contract.  Terms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.'"  (Internal citations omitted.)  *Kostelnik*, 96 Ohio St.3d 1,

---

[4] The dissent argues that the December 5, 2016 "Confidential Settlement Agreement and Full Release" was an acceptance of appellants' counteroffer, but does not address the fact that the release contained additional or different terms.

[5] In reaching the opposite conclusion, the dissent places great emphasis on its characterization that appellants did not contest the existence of a settlement agreement in their response to the motion to enforce the settlement agreement.  This characterization, though, does not reflect appellants' arguments, wherein Frank asserted, "In fact, it was my understanding, after numerous discussions and e-mails with my counsel that even if I signed this original [November 2, 2016] informed consent, I would indeed have the choice of accepting the final settlement, if and when, it was offered."  From this statement, Frank was clearly indicating that he did not believe there was a settlement agreement, only preliminary negotiations.  Furthermore, Frank's understanding that the settlement agreement was not final is supported by the emails from his counsel as of December 2016 informing him that he still had the option "to decline the settlement once the full terms were disclosed."  The dissent argues that poor advice or inadequate legal representation is not sufficient to repudiate a settlement agreement, but this argument misses the point that Frank's belief that he could still decline the settlement goes to whether there was a true meeting of the minds.

30.

2002-Ohio-2985, 770 N.E.2d 58, at ¶ 15, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, 75 N.E.2d 608 (1st Dist.1947).

{¶ 55} "To constitute a valid settlement agreement, the terms of the agreement must be reasonably certain and clear." *Rulli*, 79 Ohio St.3d at 376, 683 N.E.2d 337.

"A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are."

*Id.*, quoting 1 Corbin on Contracts (Rev. Ed.1993) 525, Section 4.1. While "it is generally within the discretion of the trial judge to promote and encourage settlements to prevent litigation * * * * [a] trial judge cannot, however, force parties into a settlement." *Id.*

{¶ 56} Appellees sought to enforce the settlement agreement under the terms of the December 5, 2016 "Confidential Settlement Agreement and Full Release." It is indisputable that appellants refused to sign the December 5, 2016 "Confidential Settlement Agreement and Full Release." Thus, to have those terms enforced, it was incumbent upon appellees to demonstrate that those terms accurately reflected the oral settlement agreement that was purportedly reached following the mediation sessions.

31.

However, appellees presented no evidence to establish the terms of the oral settlement agreement.

{¶ 57} As evidence of the oral agreement, appellees cited the September 30, 2016 email, wherein Zoll & Kranz relayed,

> Group A
>
> [Redacted] people have accepted the allocated offer. [Redacted] of those have returned a signed form and we are still waiting on the remaining [redacted]. The total amount allocated to these [redacted] was [redacted].
>
> Group B
>
> [Redacted] people, [redacted] and [redacted] have accepted the allocated offer contingent on resolution of their liens such that they do not have to pay any subrogation. Both live in "made-whole" states where subrogation is not due until the client has been made whole and we have sent letters to both subrogation carriers demanding that they waive their liens. The total amount allocated to these [redacted] is [redacted].

On appeal, appellees also point to the "Informed Consent Acknowledgment and Consent to Settle" that appellant signed on November 2, 2016, as evidence that a settlement agreement was reached. Yet, neither the September 30, 2016 email, nor the November 2, 2016 informed consent form set forth any terms of the settlement agreement other than

32.

the amount.[6] Those two documents do not set forth any terms regarding Medicare releases, confidentiality and non-disparagement, appellants' release of any future claims against appellees, or the dismissal of appellants' present claims with prejudice.

{¶ 58} Appellees also cite, as evidence that a settlement agreement existed, the inclusion of Frank Aceste on two lists sent by Zoll & Kranz on November 29 and 30, 2016. While those emails could potentially support the existence of an earlier agreement to settle, they too—like the September 30, 2016 email and the November 2, 2016 informed consent form—do not provide any details on the terms of the settlement agreement. Likewise, the entire email chain that began on November 23, 2016, does not describe any of the terms of the settlement agreement.

{¶ 59} The first, and only, evidence of the specific terms of a settlement agreement is found in the December 5, 2016 "Confidential Settlement Agreement and Full Release." But there is nothing in the record tying those terms to the oral settlement agreement that was allegedly reached following the mediation sessions; there is no separate evidence of the terms of the oral settlement agreement for comparison, there is no affidavit attesting that those were the terms of the oral settlement agreement, and there is no testimony to that effect either. Simply put, appellees cannot rely solely on a rejected written proposal to establish the terms of a prior oral agreement. *See Apple v.*

---

[6] While the November 2, 2016 informed consent form did reference the terms of the settlement offer as set forth in an attached letter, that letter was not provided to the trial court before it entered its decision on appellees' motion to enforce the settlement agreement.

33.

*Hyundai Motor Am.*, 2d Dist. Montgomery No. 23218, 2010-Ohio-949, ¶ 10 ("Hyundai could not use the written settlement document to impose additional duties on the Apples to which they had not agreed.").

{¶ 60} Because of the lack of any evidence of the terms of the oral settlement agreement, the present case is distinguishable from the cases relied upon by appellees. Illustratively, appellees cite three cases as examples of settlement agreements that were enforced even though they were made outside of the presence of the court and were not reduced to a signed writing.

{¶ 61} In *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, 118 N.E.3d 439, ¶ 10 (8th Dist.), the plaintiff moved to enforce a settlement agreement, arguing that the parties had agreed to mutually dismiss their claims at their own costs. Attached to the plaintiff's motion was an email exchange in which counsel for the plaintiff stated, "I wanted to confirm what we talked about earlier today. Your client will agree to a mutual dismissal of all claims, with prejudice. Each party to bear their own costs with a broad release. You can draft the release." Counsel for the defendant replied, "Yes * * * provided it's happening ASAP and not after I do a bunch more work." *Id.* at ¶ 7. Several days later, counsel for the plaintiff inquired how the release was coming along, and counsel for the defendant responded that he "was working on it * * * no worries." *Id.* at ¶ 8. However, several days after that, the defendant changed his mind and no longer wished to enter into a settlement agreement. *Id.* The defendant argued that there was no enforceable settlement agreement because he never signed a written agreement, and because the email

34.

communications did not contain any clear and definite terms. *Id.* at ¶ 11. On appeal, the Eighth District affirmed the trial court's decision to enforce the settlement agreement, rejecting the defendant's contention that the terms of the settlement agreement were vague and indefinite. The Eighth District reasoned that the emails "clearly reflect a definite offer and acceptance concerning the parties' agreement to mutually dismiss their claims with prejudice at their own cost. Given the implications of a dismissal of all claims at the parties' own cost, no further action or discussion of additional terms was contemplated or required. In short, no unresolved contingencies remained." *Id.* at ¶ 21.

{¶ 62} In *Cugini & Capoccia Builders, Inc. v. Tolani*, 5th Dist. Delaware No. 15 CAE 10 0086, 2016-Ohio-418, ¶ 11, the plaintiffs filed a motion to enforce a settlement agreement, which the trial court granted. The court ordered, "In accordance with the parties' settlement agreement, judgment is granted in favor of the Plaintiff against the Defendants for $35,000, and the Plaintiff is ordered to complete the designated list of work items." *Id.* at 25. On appeal, the Fifth District affirmed. The Fifth District found that the trial court had reviewed the correspondence between the parties, and that the correspondence showed that the parties agreed that (1) the defendants would pay the plaintiff $35,000, (2) the plaintiff would complete a defined list of work items; and (3) the defendants would deposit the funds into their attorney's trust account, and the funds would be released upon completion of the work. *Id.* at ¶ 19. Thus, the Fifth District concluded that the trial court's order finding the existence of a completed settlement agreement was proven by clear and convincing evidence. *Id.* at ¶ 21.

35.

{¶ 63} Finally, in *Apple v. Hyundai Motor Am.*, 2d Dist. Montgomery No. 23218, 2010-Ohio-949, ¶ 10, the Tenth District affirmed the trial court's decision to grant the defendant's motion to enforce a settlement agreement. In that case, the plaintiffs sued the defendant for breach of Ohio's Lemon Law. The plaintiffs orally proposed to settle the lawsuit in return for a $7,000 payment from the defendant. The defendant accepted the offer, and confirmed acceptance by sending a letter to counsel for the plaintiffs. The defendant then sent the plaintiffs a copy of a standard form of release that it used when settling litigation. *Id.* at ¶ 3. The next day, counsel for the plaintiffs sent the standard release back to the defendant with two of the paragraphs crossed out. Notations in the margin explained that the paragraphs had not been agreed to by the plaintiffs. The paragraphs provided for non-disclosure, and that the plaintiffs would indemnify the defendant for future losses arising from claims by third parties. Counsel for the plaintiffs explained that the settlement would remain intact if those two paragraphs were removed from the release. *Id.* at ¶ 4. Before the defendant responded, the plaintiffs contacted their counsel and explained that they no longer wished to settle because they were continuing to have problems with their car. *Id.* at ¶ 5. Counsel then relayed that the plaintiffs would not abide by the settlement agreement, and the defendant responded by filing a motion to enforce the settlement agreement, while agreeing in the process to delete the two objectionable paragraphs. *Id.* On appeal, the Tenth District reasoned that while the defendant could not use the written settlement document to impose additional duties, the

36.

plaintiffs could not repudiate their performance promised in the oral agreement. *Id.* at ¶ 10.

{¶ 64} *Turoczy*, *Cugini*, and *Apple*, are all distinguishable from the present case, because in each of them, although the settlement agreements were not reduced to a signed writing, evidence was presented establishing enforceable terms of an oral agreement. For the same reasons, appellees reliance on *Santomauro v. Sumss Property Mgmt., LLC*, 2019-Ohio-4335, 134 N.E.3d 1250, ¶ 4 (9th Dist.) (settlement agreement read into the record in open court); *Mathews v. E. Pike Local School Dist. Bd. Of Edn.*, 4th Dist. Pike No. 12CA831, 2013-Ohio-4437, ¶ 11 (the trial court held a hearing and received testimony that Mathews' attorney was authorized to accept the settlement agreement); *Aber v. Vilamoura, Inc.*, 184 Ohio App.3d 658, 2009-Ohio-3364, 922 N.E.2d 236 (9th Dist.) (testimony taken at a hearing on the motion to enforce the settlement agreement from the parties' lawyers); *Kostelnik*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58 (examined the evidence surrounding the settlement agreement—which included a letter from one of the defendants confirming the settlement agreement, the releases separately provided by the two defendants, Kostelnik's conduct of not objecting to the terms of the releases and seeking approval of the settlement and distribution of the proceeds from the probate court, and Kostelnik's later action of seeking relief from judgment against only one of the defendants—and concluded that joint and several liability was not one of the terms of the settlement agreement); and *Spercel v. Sterling Indus., Inc.*, 31 Ohio St.2d 36, 38, 285 N.E.2d 324 (1972) (hearing was held on the motion to vacate, at which the trial

37.

judge in the original action testified that the parties had come to a firm agreement), is likewise misplaced.

{¶ 65} In contrast, here, the only term of the oral settlement agreement that appellees have established is the amount. There is no evidence that the remainder of the terms contained in the December 5, 2016 "Confidential Settlement Agreement and Full Release" were part of the oral settlement agreement.[7] Thus, even if we held that there was an offer and acceptance of the oral settlement agreement, that agreement is not enforceable because the terms have not been defined. *See Rulli*, 79 Ohio St.3d at 376, 683 N.E.2d 337 ("A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract."). Therefore, we hold that the record does not demonstrate an enforceable oral settlement agreement.

{¶ 66} Finally, we find that Zoll & Kranz's conduct following appellants' rejection of the December 5, 2016 "Confidential Settlement Agreement and Full Release" cannot establish a settlement agreement between the parties. In its decision granting the motion to enforce the settlement agreement, the trial court alternatively found that Zoll & Kranz's raising of an issue regarding the Medicare language of the December 5, 2016 "Confidential Settlement Agreement and Full Release" constituted a counteroffer, which appellees accepted. The trial court's alternative reasoning, however, ignores that in all of its correspondence on this issue, Zoll & Kranz expressly notified appellees that it did not

---

[7] Notably, despite concluding that the terms of the rejected "Confidential Settlement Agreement and Full Release" should be enforced, the dissent does not point to any evidence linking those terms to the terms of any purported oral settlement agreement.

38.

have client consent: on January 27, 2017, "We do not have client consent but we at least wanted to give you a draft to consider;" also on January 27, 2017, "I have not yet been able to get the client on board;" and on January 30, 2017, "We do not yet have client consent yet." "An attorney who is without special authorization has no implied or apparent authority, solely by virtue of his general retainer, to compromise and settle his client's claim or cause of action." *Morr v. Crouch*, 19 Ohio St.2d 24, 249 N.E.2d 780 (1969), paragraph two of the syllabus. Thus, because appellants never gave consent to settle, Zoll & Kranz's actions following the December 5, 2016 "Confidential Settlement Agreement and Full Release" could not create a binding settlement agreement.[8]

{¶ 67} Therefore, for the above reasons, we hold that the trial court erred when it granted appellees' motion to enforce the December 5, 2016 "Confidential Settlement Agreement and Full Release."

---

[8] In concluding otherwise, the dissent asserts that although counsel acknowledged that it did not have client consent, it nonetheless was acting at appellants' behest because it presented the Medicare changes requested by appellants. We find two faults with this logic. First, and primarily, the dissent's conclusion reaches the curious result that counsel's actions, openly done without the clients' consent, can nonetheless bind the clients to a settlement agreement. Second, the dissent's conclusion is based on a faulty premise, which is that appellees agreed to all of the changes proposed by appellants. The dissent infers from appellants' opposition to the motion to enforce the settlement agreement that appellants only proposed changes to the Medicare release language. In so doing, the dissent expresses confusion as to why appellants would state that appellees "did not agree to all the changes." In fact, appellants proposed multiple changes to the "Confidential Settlement Agreement and Full Release," including a change to the amount of the settlement, but appellants' counsel only presented the Medicare release language proposals to appellees. (See markups to "Confidential Settlement Agreement and Full Release" attached to appellants' October 10, 2017 pro se motion for stay on judgment.)

39.

**{¶ 68}** Accordingly, appellant's seventh and thirteenth assignments of error are well-taken.

**{¶ 69}** Because we hold that the record does not demonstrate an enforceable settlement agreement between the parties, appellants' remaining assignments of error are denied as moot.

## IV.  Conclusion

**{¶ 70}** For the foregoing reasons, we find that substantial justice has not been done the party complaining.  The August 21, 2017 judgment entry granting appellees' motion to enforce settlement agreement, and the July 25, 2019, judgment entry dismissing the case with prejudice, are hereby reversed and vacated, and this matter is remanded to the trial court for further proceedings consistent with this decision.  Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.           _____
                                                          JUDGE
Thomas J. Osowik, J.          
CONCUR.
                                          _____
                                                           JUDGE


Christine E. Mayle, J.,
DISSENTS AND WRITES
SEPARATELY.

**MAYLE, J.**

{¶ 71} Respectfully, I dissent. In my view, the record clearly demonstrates that the parties reached a binding settlement agreement. Indeed, Frank Aceste filed a pro se response to appellees' motion in which *he did not contest the existence of a settlement agreement*. Instead, he argued that "the settlement agreement should be voided" because his attorneys supposedly pressured him into it while he was in pain and lacked the capacity to contract, and because his attorneys allegedly provided inadequate advice and poor legal representation during the pendency of his case. The record, however, is devoid of any evidence to support such claims—which, in any event, are not a valid basis to void a binding contract. I would therefore affirm the trial court's August 21, 2017 order to the extent that it enforced the parties' settlement agreement.

{¶ 72} But, I believe that the trial court erred on May 16, 2018, when it amended its August 21, 2017 decision by adding an ambiguous statement of relief. That is—as appellants argue in their eleventh assignment of error—the May 16, 2018 order is ambiguous because the statement of relief does not specify *which version* of the Confidential Settlement Agreement and Full Release and Joint Dismissal must be signed. This ambiguity is problematic because "a court order cannot be enforced in contempt unless the order was 'clear and definite, unambiguous, and not subject to dual interpretations.'" *City of Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 23.

41.

{¶ 73} Because the trial court dismissed the action as a sanction for appellants' contempt of court—i.e., their failure to follow an ambiguous court order— I would find appellants' eleventh assignment of error well taken. I would reverse and remand this matter to the trial court so that it could enter judgment pursuant to the terms of the settlement agreement and dismiss the case with prejudice. That way, both parties—not just appellees—would receive the benefit of the contract they agreed upon.

### 1. The parties agreed upon the essential elements of a contract.

{¶ 74} The "[e]ssential elements" of any contract, including settlement agreements, include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual asset and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D. Ohio 1976). Oral settlement agreements are enforceable in Ohio, and the terms of such agreements "may be determined from 'words, deeds, acts, and silence of the parties.'" *Id.* at ¶15, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, 75 N.E.2d 698 (1st Dist.1947), paragraph one of the syllabus. As this court has recognized, "[c]omplete clarity in every term of the agreement is unnecessary because all agreements have some degree of indefiniteness and uncertainty." *Advantage Renovations, Inc. v. Maui Sands Resort, Co., LLC,* 6th Dist. Erie No. E-11-040, 2012-Ohio-1866, ¶ 18, citing *Kostelnik* at ¶ 17. Indeed, "seldom, if ever, does the evidence in proof of an oral contract present its

42.

terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required." *Id.*, quoting *Rutledge* at 86. Courts enforce oral contracts for one simple reason: people must be held to the promises they make. *Id.*

{¶ 75} Acccording to the record, on or about August 11, 2016, a private mediation session between appellees and Zoll & Kranz, legal counsel for 22 different CerviCore and FlexiCore recipients, including Frank Aceste, resulted in a global settlement offer from appellees for a set amount, to be allocated between the 22 claimants, in exchange for their dismissal of claims against the appellees. The mediation was conducted by former federal Magistrate Judge Diane M. Welch. In addition, Zoll & Kranz retained former federal district court Judge Richard B. McQuade as a special master to determine the allocation of the settlement monies amongst the settling claimants.

{¶ 76} On September 30, 2016, Zoll & Kranz sent an email to appellees' counsel—with a copy to Judge Welch—indicating that appellants (among other claimants) "have accepted the allocated offer," and that Zoll & Kranz had received signed forms back from some—but not all—of the claimants that had accepted. This email also states that two of the 22 claimants rejected the offer.

{¶ 77} On November 2, 2016, Frank Aceste signed a form for his attorneys titled "Informed Consent Acknowledgment and Consent to Settle" in which he confirms that he agreed to settle his claim in exchange for his allocation of the settlement proceeds (which is specified by dollar amount in the document). Although this document was intended to be a confidential attorney-client communication (indeed, it is specifically marked as

43.

such), Frank Aceste attached the Informed Consent document to his pro se response to appellees' motion to enforce settlement. He did not, however, attach the accompanying letter from his attorneys (that is referenced in the document) that outlines the terms of the parties' settlement agreement beyond the essential terms that are summarized in the Informed Consent.[9]

{¶ 78} From there, the parties anticipated that there would be two different versions of the written settlement agreement and release—one form would be used for Medicare recipients, and another form would be used for non-Medicare recipients. To that end, on November 29, 2016, Zoll & Kranz emailed appellees' counsel with an attached document that listed all settled individuals and their Medicare status. Frank Aceste is on the list of settled individuals, and he is identified as a Medicare recipient. In response to this email, appellees' counsel asked for another list that includes "the actual allocations to each person."

{¶ 79} The next day, November 30, 2016, Zoll & Kranz sent appellees' counsel another spreadsheet, this one identifying all of the settling claimants and their allocated

---

[9] Frank did, eventually, submit the accompanying letter from Zoll & Kranz to the trial court, and the letter does, in fact, outline additional details of the parties' settlement agreement. But, as the majority recognizes, that letter was not before the trial court when it ruled on appellees' motion. Although that letter would have made it even easier for the trial court to have found an enforceable settlement agreement, I agree that we should not consider it because it was not before the trial court when it ruled on the motion. Regardless, for reasons discussed, the record before the trial court at the time of appellees' motion fully supports its decision to enforce the parties' settlement agreement.

44.

settlement amount. Once again, the spreadsheet that Zoll & Kranz sent to appellees' counsel identified Frank Aceste as a settled individual.

{¶ 80} On December 5, 2016, appellees' counsel emailed a written "Confidential Settlement Agreement and Full Release" to plaintiffs' counsel. The written agreement identifies Frank and Rhonda Aceste as the "RELEASORS," and the appellees as the "RELEASEES." Most relevant to the current dispute, the written settlement agreement contains four separate paragraphs addressing various implications that Medicare may have on the parties' settlement as a matter of law, including the following:

> 2.12 RELEASORS understand that should the Center for Medicare and Medicaid Services ("CMS") find that a Medicare Set-Aside Allocation should have been established and/or that Medicare's interests were not adequately protected, CMS (Medicare) may require RELEASORS to expend up to the entire settlement amount on Medicare covered expenses related to the injury before Medicare will provide coverage for the injury. * * *

{¶ 81} As demonstrated through the confidential attorney-client communications that Frank Aceste attached to his pro se response to appellees' motion, this provision regarding a potential Medicare Set-Aside ("MSA") prompted Frank to raise some issues with his attorneys that were, apparently, never discussed before. Specifically, it appears that Frank asked Zoll & Kranz whether he would need an MSA, and for how much, given that two doctors in New York had told him that he will need explant surgery to remove

45.

the medical device.  On December 28, 2016, Zoll & Kranz advised him that he "may" need an MSA if he has future medical costs, but that they would have to do an MSA analysis after the settlement was finalized.  In response, on January 5, 2017, Frank sent Zoll & Kranz an email that included the following:

> I would think that this should have been done initially before determining the share amount of the settlement.  The people who had the device removed are getting more money to cover the medicare payback but I have to set aside money for future medical costs without any monetary consideration to offset the set aside.  I cannot make a decision without knowing what the MSA will be.  If you are confident that there will be no MSA as previously stated and are willing to move ahead with the settlement on that statement I might be able to reach a decision.  I might also consider settling if the amount was adjusted to cover an MSA in your point system.

{¶ 82} On January 6, 2017, Zoll & Kranz responded via email, telling him that the allocation was done by a neutral third party (retired Judge McQuade) and that they could not change his settlement allocation.  His attorney also stated:

> [Y]ou are right that I didn't know of the need for the MSA until you brought up that 2 doctors in NY told you that you needed the explant surgery.  I had reviewed all your medical records before talking to you and did not see any indication that a neurosurgeon was recommending the

46.

surgery, so I saw no need for the MSA. Once you told me that, though, I realized we do need the independent analysis. Normally I would have seen this situation coming much sooner, but, please remember that we didn't order the medical records from these doctors based on your request that we do not order them.

{¶ 83} Zoll & Kranz went on to explain that if he decides to "opt out" of the settlement, then the defendants could possibly approach him about settling on other terms, but they could also "refuse any more settlement talks and we'll prepare for trial over the next 18-24 months."

{¶ 84} In response, Frank told his attorneys on January 11, 2017, that "I have decided to opt out of the settlement agreement and to continue litigation." His attorney at Zoll & Kranz responded that day, stating that "you had said 'yes' to the settlement when our estimated proceeds were [x].[10] That hasn't changed, right? I mean, if the MSA was zero, you would be signing everything, right?" In that same email, his attorney suggested that they get the MSA done at a certain percentage that he could live with, and that he is "still pushing for zero, and if not zero, then 5% or 8% or 10%...etc." The next day—January 12, 2017—Frank responded by stating:

> The MSA, which was brought to light with the final settlement docs, has raised some issues I had not thought of earlier.

---

[10] The specific dollar amount of appellants' settlement proceeds has been omitted for confidentiality purposes.

47.

> This settlement is unacceptable regardless of MSA and I will take my chances.
>
> Stryker should have disclosed the full settlement details from the start.

Notably, Frank Aceste did not submit any correspondence that he may have had with his attorneys after January 12, 2017.

{¶ 85} Appellees, however, submitted an email from Zoll & Kranz to appellees' counsel that was sent 15 days later—on January 27, 2017—that attached a revised version of the written settlement agreement and release between the parties. The proposed revisions from Zoll & Kranz deleted the four paragraphs that had addressed potential Medicare-related issues, including the possibility of an MSA. In addition, Zoll & Kranz provided a letter stating that they had "provided Frank with an opinion letter that a Medicare Set Aside ("MSA") is not required in his case" and explaining why, in their opinion, an MSA would not be required for Frank Aceste. The letter further advises appellees that Zoll & Kranz would directly hold harmless and indemnify appellees from any potential Medicare-related liability in connection with Frank Aceste.

{¶ 86} On January 30, 2017, appellees' counsel accepted the opinion letter, along with the proposed edits to the written agreement, and proposed the addition of one "clarifying edit" to specify that the Release releases future claims as well as present claims. On February 3, 2017, Zoll & Kranz e-mailed appellees' counsel "a copy of the

48.

final release" that incorporated the proposed edits of January 27, as well as the additional edit that appellees' counsel had sent on January 30.

{¶ 87} Although the Zoll & Kranz email dated January 27, 2017, stated that "[w]e do not have client consent but we at least wanted to give you a draft to consider," and the Zoll & Kranz email dated February 3, 2017, stated "[w]e still have not heard from the client but we are going to overnight this document to him along with a copy of the opinion letter," the record suggests that counsel's negotiations regarding the language of the written settlement agreement and release was, in fact, done at Frank Aceste's behest. That is, Frank Aceste states in his pro se response to appellees' motion:

> I relayed my concerns with respect to the final settlement agreement. The agreement contained language prohibiting the use of Medicare which is my only source of medical coverage. I told them I would be committing fraud if I signed the statement as it was. There were also issues regarding the potential need for a Medicare set aside, which also, were never disclosed or discussed until this point. (Exhibit 3). ***After much back and forth, the partner, requested <u>my edits</u> and finally agreed to present them to Stryker***. The partner relayed that Stryker agreed to the changes, but when the final settlement agreement was sent, it did not reflect all the changes. I was then told that Stryker did not agree to all the changes.

It is unclear why Frank Aceste argued that appellees "did not agree to all the changes" because, from the record before the court, appellees accepted all of the proposed edits that they received from plaintiffs' counsel.[11]

{¶ 88} Regardless, it is abundantly clear from the record that the essential elements of a settlement agreement existed—i.e., the parties had expressed their mutual assent to settle the litigation for an agreed-upon sum of money—thereby forming a valid settlement agreement. That is, the record demonstrates that, at the mediation session before Judge Welch, the appellees made an offer to settle with all 22 claimants for a global sum, which was to be allocated between those 22 claimants by special master Judge McQuade. This offer was accepted by Frank Aceste, as communicated to

---

[11] The majority maintains that appellees did not agree to all of Frank's changes, and references a handwritten markup of the Confidential Settlement Agreement and Full Release that Frank sent to his attorneys on January 19, 2017. That communication, however, was not before the trial court when it decided the appellees' motion and, therefore, that document should not be considered by this court. And, we do not know what attorney-client communications transpired between January 19, the date of that document, and January 27, when Zoll & Kranz emailed appellees with proposed edits on the written contract. Regardless, as the majority points out, the major edit that Frank proposed in that January 19 document—other than the deletion of the Medicare-related provisions—was an upward adjustment of his settlement allocation (by more than 75%) because, as he writes in the margin, "I have been told by a physician that device needs to be removed." But, as I discuss further below, Frank had already agreed to accept his settlement allocation—which was an essential element of the parties' agreement—and, as evidenced by the attorney-client communications that Frank *did* attach to his response to appellee's motion, Zoll & Kranz had already properly advised him that "[w]e cannot change the allocation; that's set now."

50.

appellees through his attorneys' emails dated September 30, 2016, November 29, 2016, and November 30, 2016, and as he confirmed in writing to his attorneys on November 2, 2016.

{¶ 89} Moreover, in my view, the back-and-forth communications between Frank Aceste and Zoll & Kranz also confirm that Frank agreed to settle his claims for his allocated share of settlement funds. That is, once the possibility of an MSA was brought to light through the language of the proposed settlement agreement and release, Frank Aceste wanted to undo the settlement because he feared that an MSA would eviscerate his ultimate recovery of settlement proceeds. Indeed, Frank did not correct his attorney when he stated "you had said 'yes' to the settlement when our estimated proceeds were [x]." Instead, Frank responded by stating that "[t]he MSA, which was brought to light with the final settlement docs, has raised some issues I had not thought of earlier." The settlement agreement is not any less enforceable just because Frank Aceste may have believed, in hindsight, that he made a bad deal.

{¶ 90} In fact, Frank Aceste's own representations to the trial court are perhaps the strongest evidence of a binding contract. In his pro se response to appellees' motion, Frank *did not dispute that he accepted the offer* and *did not dispute the existence of a settlement agreement*. Rather, he argued that "the settlement agreement should be voided" and "relay[ed] the reasons [he] believe[d] the settlement should not be enforced." He claimed that he agreed to the settlement "under extreme pressure, while in a depressive state, without my full and complete knowledge of both what I was agreeing to

51.

and the ramifications of the agreement." That is, he argued that the parties' settlement agreement should be voided because (1) he lacked capacity to contract, (2) he was under undue influence from his attorneys to settle, and (3) his attorneys had advised him that he could change his mind after reviewing the written settlement agreement.[12] The trial court properly rejected these arguments.

{¶ 91} First, the record is devoid of any evidence—let alone clear and convincing evidence—that Frank Aceste lacked the capacity to contract. *In re Estate of Flowers*, 2017-Ohio-1310, 88 N.E.3d 539, ¶ 84 (6th Dist.) (lack of mental capacity must be established by clear and convincing evidence). Although Frank claimed that he did not understand that he was entering a binding contract, there is no evidence that any mental illness affected his mind to such a degree that he was *incapable* of understanding that he was entering a binding contract. *Miller v. Miller*, 9th Dist. Summit No. 21770, 2004-Ohio-1989, ¶ 16 (a party lacks capacity to contract where his mind was so affected "as to destroy [his] ability to understand the nature of the act in which he [wa]s engaged, its scope and effect or its nature and consequences.").

---

[12] Frank also argued in his pro se response that his wife and co-plaintiff, Rhonda Aceste, "was never involved in any of the discussions nor agreed to any part of the settlement." Rhonda, however, did not sign the pro se filing, and Frank could not make any arguments on Rhonda's behalf because he is not a licensed attorney. Regardless, Rhonda's claim is derivative of Frank's claims and, accordingly, could not stand on its own after Frank settled his claims with appellees. *Wagner v. Westfield Cos.*, 6th Dist. Fulton No. F-02-013, 2002-Ohio-6367, ¶ 21 (if the main claim is dismissed, "the derivative claim fails as well.") It is notable, however, that while Frank argued that *Rhonda* did not agree to the settlement, he never argued that *he* did not agree to the settlement.

52.

{¶ 92} Second, regarding Frank's claims of undue influence, "[t]o avoid a contract on the basis of duress, a party must prove coercion *by the other party to the contract*. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." (Emphasis added.) *Patton v. Wood Cty Humane Soc.*, 157 Ohio App.3d 670, 2003-Ohio-5200, 798 N.E.3d 676, ¶ 27 (6th Dist.), quoting *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 551 N.E.2d 1249 (1990), syllabus. Frank did not allege any undue influence by appellees.

{¶ 93} Finally, Frank argued that his attorneys advised him that "[he] would still have a right to decline the settlement once the full terms were disclosed." That, however, is not a valid basis to unravel an otherwise valid settlement agreement. "In spite of the ignorance as to the language they speak and write, with resulting error and misunderstanding, people must be held to the promises they make." *Kostelnik*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 17. The majority maintains that "Frank's belief that he could still decline the settlement goes to whether there was a true meeting of the minds." To the contrary,

> [i]f one person does not intend to be bound by an agreement he has made, and the other person is not aware of that lack of intention, there is no 'meeting of the minds' as a layman might understand the phrase. Nevertheless, unless there is a mutual mistake or some like occurrence, the law is only interested in objective manifestations of intent. * * * Expressions of assent are generally sufficient to show a meeting of the

minds. Thus, one person's unexpressed reservation does not prevent there being a meeting of the minds as that term is recognized in law. *Rudd v. Online Res., Inc.*, 2d Dist. Montgomery No. 17500, 1999 WL 397351, *5 (June 18, 1999), citing *Nilavar v. Osborn*, 127 Ohio App.3d 1, 711 N.E.2d 726 (2d Dist.1998). Indeed, as this court has recognized, "a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party. To the extent that his real, secret intention differs therefrom, it is entirely immaterial." *Bulger v. Bulkowski*, 6th Dist. Sandusky No. S-83-3, 1983 WL 6799, *2 (May 20, 1983), quoting *Perlmuter Printing Co.* 436 F.Supp. at 415. Here, because Frank's outward manifestations are sufficient to show a meeting of the minds, there is a binding agreement even though Frank may have believed—for whatever reason—that he could change his mind later.

{¶ 94} Moreover, even if it is assumed—for purposes of argument only—that Frank received poor advice or inadequate legal representation from his attorneys, "[a] party cannot attempt to repudiate a settlement agreement by simply asserting a change of heart or an assertion of poor legal advice." *Kerwin v. Kerwin*, 6th Dist. Lucas No. L-04-1002, 2004-Ohio-4676, ¶ 7. Indeed, much of Frank Aceste's pro se response to appellees' motion is devoted to complaints about his attorneys. For example, he argues the settlement agreement should be undone because "[n]o discovery was ever requested," "[c]ounsel did not research my case at all," and because his attorneys failed to solicit "all of [his] doctors * * * for information and records about my condition." Any such issues

54.

between Frank and his attorneys have no bearing on the enforceability of the parties' settlement agreement.

{¶ 95} For all these reasons, I believe that the essential elements of a settlement agreement exists between the parties.

### 2. The majority's view of offer and acceptance is too narrow.

{¶ 96} The majority, however, finds that the evidence does not support the existence of an offer and acceptance because (1) the original offer required all 22 claimants to accept and two claimants rejected the offer, which means that the Zoll & Kranz email on September 30, 2016, was actually a counteroffer to settle with less than all claimants, which rejected the initial offer, and (2) the December 5, 2016 email from appellees' counsel, attaching the initial draft of the Confidential Settlement Agreement and Full Release, constituted yet another counteroffer that the appellants rejected. I disagree.

{¶ 97} First, it is true that appellees' initial settlement offer required all 22 claimants to accept, and the September 30, 2016 email from plaintiffs' counsel stated that 20 claimants (including appellants) accepted the offer but two claimants had rejected. The majority reasons that the September 30 email was actually a counteroffer that "constituted a rejection of the original offer, and therefore appellants' purported acceptance of the original offer as evidenced by Frank's November 2, 2016 signing of the informed consent form was ineffective to create a binding settlement agreement."

55.

**{¶ 98}** But even if the September 30, 2016 email from plaintiffs' counsel was a counteroffer that rejected appellees' original offer, it was necessarily a counteroffer from the 20 claimants that wished to dismiss their claims for their allocated share of the settlement funds—*including Frank Aceste*.  And appellees accepted that counteroffer from Frank, as demonstrated by their counsel's December 5, 2016 email that forwarded a draft agreement and release to memorialize the parties' settlement.  *Kostelnik*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 16 (a contract may be determined from the "words, deeds, acts, and silence of the parties").  Indeed, as plaintiffs' counsel confirmed in an email to Frank's sister on December 13, 2016, appellees "said they would go forward with the 20 of 22"—i.e., they accepted Frank's counteroffer.

**{¶ 99}** In my view, the majority errs by focusing on the date that Frank signed the Informed Consent document as if that document is the only evidence that Frank accepted appellees' settlement offer—which, in turn, leads the majority to conclude that Frank's acceptance must have occurred on November 2, 2016, or not at all.  While that document is certainly the clearest indication of Frank's acceptance—it states "I accept," specifies the amount of his settlement allocation, and includes his signature at the bottom—it is not the only evidence that Frank agreed to accept his allocated share to dismiss his case.[13]  As

---

[13] For these same reasons, appellants' reliance upon an unexecuted "Revised" Informed Consent document, dated December 6, 2016, is misplaced.  It is unclear when, or why, Zoll & Kranz sent that document to appellants for their signature, and that document was not before the trial court when it ruled on the motion to enforce settlement agreement.  Regardless, as explained above, there is still a great deal of evidence in the record that

56.

this court has recognized, such formal precision in terms of "I offer" and "I accept" is not required when dealing with oral contracts because "seldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts." *Advantage Renovations,* 6th Dist. Erie No. E-11-040, 2012-Ohio-1866, at ¶ 18, quoting *Rutledge,* 81 Ohio App. at 86, 75 N.E.2d 608.

{¶ 100} Here, the September 30, 2016 email from plaintiffs' counsel indicated that 20 claimants "*have accepted* the allocated offer," but they were still waiting for signed forms from a few of the claimants—which demonstrates that Frank Aceste had already accepted the offer as of September 30, and then subsequently confirmed his acceptance by signing the Informed Consent for his attorneys.[14] Frank's acceptance is further confirmed through his back-and-forth discussions with his attorneys—which, in my view, show that he did, in fact, accept the allocated offer but had a change of heart after realizing that his case could require an MSA. Indeed, the Medicare-related provisions of the written agreement were the only terms of the written settlement agreement that he disputed in those privileged communications with his attorneys—further demonstrating his prior acceptance of the essential elements of the contract. Finally—and most crucially, in my opinion—Frank Aceste recognizes the existence of a settlement

---

demonstrates Frank's acceptance of appellees' offer to settle—including but not limited to Frank Aceste's own statements to the trial court.

[14] If the September 30 email is more properly viewed as a counteroffer, then Frank Aceste confirmed his *counteroffer* to settle for his allocated share when he signed the Informed Consent on November 2.

57.

agreement, repeatedly, and in his own words, throughout his pro se response to appellees' motion. The majority ignores those admissions, but in my view, those admissions demonstrate that the essential elements of the settlement agreement were undisputed.

{¶ 101} I also disagree with the majority's view that the December 5, 2016 email from appellees' counsel, attaching the initial draft of the Confidential Settlement Agreement and Full Release, "constituted yet another counteroffer that the appellants rejected." To the contrary, "[t]he mere fact that parties who have reached a verbal agreement have agreed to reduce their contract to writing does not prevent the agreement from being a contract if the writing is not made." *Santomauro v. Sumss Prop. Mgmt.*, 2019-Ohio-4335, 134 N.E.3d 1250, ¶ 37 (9th Dist.), quoting *PNC Mtge. v. Guenther*, 2d Dist. Montgomery No. 25385, 2013-Ohio-3044, ¶ 15. "It is only where the parties intend that there will be no contract until the agreement is fully reduced to writing and executed that no settlement exists unless the final, written settlement agreement is signed by all of the parties." *Id.*, quoting *Rayco Mfg., Inc. v. Murphy, Rogers, Sloss & Gambel*, 2019-Ohio-3756, 142 N.E.3d 1267, ¶ 69 (8th Dist.), *appeal allowed by*, 157 Ohio St.3d 1535, 2020-Ohio-122, 137 N.E.3d 1207 (2020). Here, there is no evidence in the record to suggest that the parties intended that there would be no contract until the anticipated written document was formally executed. And, as discussed further below, the record demonstrates that the parties agreed to all of the terms of that written contract other than the Medicare-related provisions.

58.

### 3. The parties agreed to the terms of the Confidential Settlement Agreement and Full Release, minus the Medicare-related provisions.

{¶ 102} I disagree with the majority's position that appellants "rejected" the Confidential Settlement Agreement and Full Release. In my view, the back-and-forth correspondence in the record—including the correspondence between Frank Aceste and his attorneys at Zoll & Kranz, as well as the correspondence between Zoll & Kranz and appellees—shows that the parties agreed upon all of the terms of the Confidential Settlement Agreement and Full Release except the Medicare-related provisions.

{¶ 103} This case is similar to *Apple v. Hyundai Motor America*, 2d Dist. Montgomery No. 23218, 2010-Ohio-949. In that case, the Apples sued Hyundai for violations of the Ohio Lemon Law, R.C. 1345.72, after experiencing numerous problems with their vehicle. The Apples orally agreed to settle their lawsuit in return for a $7,021.19 payment from Hyundai. Counsel for Hyundai then sent counsel for the Apples "a copy of a standard form of release that Hyundai has used when settling litigation." *Id.* at ¶ 3.

{¶ 104} Regarding the terms of parties' agreement, the Apples took issue with only two provisions—one that provided for non-disclosure, and one that provided for indemnification of third-party claims. *Id.* at ¶ 4. Counsel for the Apples relayed these concerns to Hyundai. Before Hyundai responded, the Apples had a change of heart and decided they no longer wished to settle. Hyundai filed a motion to enforce settlement agreement, seeking to enforce the written contract minus the two provisions to which the

59.

Apples had objected.  The trial court enforced the settlement, and that decision was affirmed on appeal, wherein the appellate court stated:

> Hyundai could not use the written settlement document to impose additional duties on the Apples to which they had not agreed.  However, neither could the Apples repudiate their performance promised in the oral agreement when Hyundai agreed to remove the offending two paragraphs from the written settlement document, restoring the status quo ante.  Absent the two paragraphs to which the Apples did not agree, the oral settlement agreement remains enforceable.  *Id.* at ¶ 10.

{¶ 105} Similarly here, Frank never disputed any provision of the written contract other than the Medicare-related provisions.  Ultimately, appellees agreed to delete those provisions, including the provision regarding an MSA.  Like the agreement at issue in *Apple*, the written settlement agreement remains enforceable—minus those Medicare-related provisions.   As the trial court properly concluded, Frank signaled his acceptance of the remainder of the written provisions through his "words, deeds, acts, and silence." *Kostelnik*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 15.

{¶ 106} The majority, however, wholly discards the trial court's interpretation because Zoll & Kranz stated that they "do not have client consent" when they proposed edits to the settlement agreement that deleted the Medicare-related provisions but left the rest of the agreement untouched.  But despite counsel's statements in those emails, there is still sufficient evidence in the record to support the trial court's conclusion that Zoll &

60.

Kranz *did* act with Frank Aceste's authority when it sent those edits. Most importantly, Frank Aceste makes an express representation in his pro se response to appellees' motion that he relayed his "concerns" with the language in the written agreement—which was limited to the Medicare provisions—to his attorneys, and "[a]fter much back and forth, the partner, requested <u>my edits</u> and finally agreed to present them to Stryker." Notably, Frank made those representations after reading appellees' motion—which attaches and relies upon those edits that Zoll & Kranz actually presented to Stryker—and Frank did not claim that his attorneys lacked the authority to present those edits to Stryker on his behalf.

{¶ 107} Moreover, this statement is largely consistent with the back-and-forth attorney-client communications that Frank attached to his pro se filing. Although Frank did not attach any attorney-client communications after January 12, 2017—when he told his attorneys that the "settlement is unacceptable"—the record contains sufficient evidence that subsequent attorney-client communications occurred (although not submitted for review) and likely culminated in the Zoll & Kranz opinion letter regarding an MSA and corresponding revisions to the settlement agreement that deleted the Medicare provisions. Again, *Frank's own words* are the strongest evidence of this.

{¶ 108} It is true that the trial court should have held a hearing on the appellees' motion. Not only was a hearing required under *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 683 N.E.2d 337 (1997), a hearing would have placed the trial court in a much better position to make the required credibility determinations regarding what Frank authorized (or

61.

didn't authorize) Zoll & Kranz to do on his behalf. Unfortunately, neither appellants nor appellees requested a hearing, and appellants did not raise the trial court's failure to hold a hearing as an assignment of error on appeal. In these situations, appellate courts review the evidentiary record that was before the trial court when it ruled on the motion to enforce settlement agreement. *See, e.g.*, *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, 118 N.E.3d 439 (8th Dist.) (where there was no hearing and no assignment of error relating to the lack of a hearing, the appellate court reviewed the record before the trial court—consisting of various correspondence between the parties—to determine whether the trial court erred by granting motion to enforce settlement); *Cugini & Capoccia Builders, Inc. v. Tolani*, 5th Dist. Delaware No. 15 CAE 10 0086, 2016-Ohio-418 (same).

{¶ 109} In this case, although no hearing was held, the record nonetheless contains express representations from Frank Aceste to the trial court—in which he expressly recognizes the existence of a settlement agreement, and states that his attorney presented "his edits" on the written document to appellees. In my view, although there are some inconsistencies in the evidence before the trial court (which should have been addressed at a hearing), Frank's own admissions to the trial court are more than sufficient to support the trial court's conclusion that counsel's actions were done with Frank Aceste's consent and, consequently, there is a binding settlement agreement between the parties. Indeed, all of Frank's objective and outward manifestations of assent—i.e., his words, acts, deeds, and silence (as I discuss at length above)—demonstrate that the parties had reached a settlement agreement, which Frank wished to "void" because he wanted more

62.

money given the possibility of an MSA. In other words, this is nothing more than a case of "buyer's remorse." Because the record before the trial court firmly demonstrates the existence of a binding settlement agreement, I would affirm the trial court's enforcement of that agreement.

**4. The May 16, 2018 order is ambiguous and cannot be enforced in contempt.**

{¶ 110} Although the trial court enforced the parties' settlement agreement on August 21, 2017, its order did not include a statement of relief or dismiss the appellants' claims. For those reasons, this court dismissed the appellants' initial appeal on December 6, 2017, so that the trial court could add a statement of relief that "set forth the parties' rights and obligations under the agreement" and dismiss the appellants' claims with prejudice.

{¶ 111} The trial court, however, did not do that. Instead, on May 16, 2018, the trial court amended its August 21, 2017 order by adding a statement of relief that ordered the parties to execute the "Confidential Settlement Agreement and Full Release and Joint Dismissal," to undertake their respective obligations in that document, and provide the court with a stipulated dismissal with prejudice by June 1, 2018. The order did not clearly and unambiguously state which version of the settlement agreement should be executed.

{¶ 112} The appellants then filed a second appeal, which we dismissed on July 19, 2018, for lack of a final, appealable order. Thereafter, on November 8, 2018, the trial

63.

court ordered the parties to "execute the Confidential Settlement Agreement and Full Release and Joint Dismissal" within 21 days.

{¶ 113} The appellants filed a third appeal instead. The third appeal was dismissed on December 20, 2018, for lack of a final, appealable order.

{¶ 114} Thereafter, on January 4, 2019, the trial court ordered the parties to execute the Confidential Settlement Agreement and Full Release and Joint Dismissal within ten days. When appellants did not sign, the trial court issued an order on May 1, 2019, stating "this is Plaintiffs [sic] final advisement: If they do not execute the settlement agreement with Defendants within twenty days of the filing of this judgment entry with the clerk of courts, the Court *will* dismiss this case upon a proper motion by Defendants." The appellants did not sign, appellees filed a motion to dismiss, and the trial court dismissed appellants' claims, with prejudice, on July 25, 2019.

{¶ 115} In my view, this chain of events is problematic for several reasons. First and foremost, as appellants argue in their eleventh assignment of error, the May 16, 2018 order—which amended the August 21, 2017 order that enforced the parties' settlement agreement—is ambiguous because the statement of relief does not specify which version of the Confidential Settlement Agreement and Full Release and Joint Dismissal must be signed. "[A] court order cannot be enforced in contempt unless the order was 'clear and definite, unambiguous, and not subject to dual interpretations.'" *City of Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 23. Because the trial court's order was ambiguous, it could not be enforced in contempt.

64.

{¶ 116} Moreover, even if the trial court had specified which version of the Confidential Settlement Agreement and Full Release and Joint Dismissal must be signed, I would still have serious concerns regarding an order that merely compels the parties to sign the settlement agreement. In that situation, a party that disputes the existence or terms of the settlement agreement is forced to either (1) obey the order by signing the settlement agreement, thereby waiving its right to appeal the existence or terms of that agreement, or (2) disobey the order, thereby suffering the imposition of sanctions (here, dismissal with prejudice) or an order of contempt.

{¶ 117} In my view, trial courts should enforce settlement agreements by entering judgment that incorporates the terms of the settlement agreement. Not only does such an order preserve the parties' appellate rights, it also avoids any guesswork on appeal regarding what, exactly, the trial court found the parties had agreed upon. *See Spercel v. Sterling Indus., Inc.*, 31 Ohio St.2d 36, 39, 285 N.E.2d 324 (1972), quoting *Herndon v. Herndon*, 183 S.E.2d 386, 388 (Ga.1971) (when enforcing a settlement agreement between the parties, "it is the duty of the court to make the agreement the judgment of the court and thereby terminate the litigation.").

{¶ 118} For example, in *Campbell v. Buzzelli*, 9th Dist. Medina No. 07CA0048-M, 2008-Ohio-425, years after the parties' divorce, Buzzelli filed a motion to modify parental rights and responsibilities, child support, and tax exemptions. The parties settled their dispute at a hearing before the court, and agreed to draft an entry representing the parties' agreement. When Campbell refused to sign the entry, Buzzelli filed a motion to

65.

enforce settlement agreement. The trial court ordered the parties to submit an agreed entry by January 19, 2017, or all pending motions would be dismissed. The parties never filed an agreed entry, and the trial court dismissed all pending motions, including the motion to enforce settlement agreement.

{¶ 119} The appellate court found this was error. It concluded that the trial court should have incorporated the parties' settlement agreement into a judgment of the court. The court stated "[w]hile we understand the trial court's frustration with the parties' inability to file an agreed upon entry, such inaction by the parties does not grant the trial court authority to ignore their settlement agreement." *Id.* at ¶ 11.

{¶ 120} Similarly here, I certainly understand the trial court's frustration with appellants. By all accounts, the trial court was very accommodating and bent over backwards to give appellants enough time and leeway to resolve this dispute themselves. But in doing so, the trial court never issued a final, appealable order that actually enforced the parties' settlement agreement and preserved the rights and obligations of both parties under that agreement.

{¶ 121} For all of these reasons, I respectfully dissent. I would affirm the trial court's August 21, 2017 order to the extent that it concluded that the parties have a binding settlement agreement. I would, however, find appellants' eleventh assignment of error well taken, and reverse and remand this matter to the trial court to issue a final judgment pursuant to the parties' settlement agreement that includes dismissal with prejudice.

66.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.